663 P.2d 992

STATE of Arizona ex rel. William J. EKSTROM, Jr., Mohave County Attorney, Petitioner,

v.

The JUSTICE COURT OF the STATE OF ARIZONA, In and For KINGMAN PRECINCT NO. 1, The Honorable Clyde A. McCune, Former Justice of the Peace thereof, and The Honorable William Gumaer, Successor Justice of the Peace thereof, and Rod Henry Aguilar, Paul Michael Jones, Kendall D. Lowe, and David Hugh Glen, Defendants and Real Parties in Interest, Respondents.

No. 16387–SA.

Supreme Court of Arizona, En Banc.

May 4, 1983.

William J. Ekstrom, Jr., Mohave County Atty. by Craig R. Friesner, Kingman, for petitioner.

Michael L. Altman, Professor, Arizona State University, Tempe, and William C. Porter, Kingman, for respondents.

Kenneth D. Freedman, Phoenix, for amicus curiae American Citizens and Lawmen Ass'n.

HAYS, Justice.

On August 26, 1982, from 7 p.m. to 12 p.m., and on September 6, 1982, from 3 p.m. to 9 p.m., every car heading south on Highway 93 near Kingman, Arizona was stopped. The stops were conducted by agents and officers of the Department of Public Safety (DPS), the Motor Vehicle Division of the Department of Transportation, and the Cooperative Enforcement Unit (a drug enforcement unit) at a port-of-entry located at the junction of U.S. 93 and Route 68. The port-of-entry consists of a building, lanes covered by an awning, lighting for night hours and traffic control devices which flash either yellow or red when the port-of-entry is in operation.

Each of the defendants in this matter was stopped at the Kingman roadblock on August 26 or September 6, 1982. Aguilar, Jones and Glen were arrested for driving while intoxicated (DWI), A.R.S. § 28–692(A) or (B), and Lowe was arrested for driving while under the influence of drugs, A.R.S. § 28–692(L) and for possession of marijuana. All the charges were filed in the Justice Court, Kingman Precinct No. 1 and were consolidated on identical motions to suppress. The justice of the peace ruled that the roadblock as it was operated in Kingman was unconstitutional under the fourth amendment to the United States Constitution and granted the motions to suppress the evidence gathered therefrom. This petition for special action was filed by the Mohave Deputy County Attorney. We have jurisdiction pursuant to rule 8, Special Actions, Rules of Procedure, 17A A.R.S.

The parties have stipulated to the following facts. The primary purpose in establishing the roadblock was to enforce the state's drunk driving laws by discovering drunk drivers; secondarily, the agents at the roadblock checked vehicle registration and licensing. The decision to operate roadblocks in Kingman was made by Lt. John Tibbetts, a DPS officer in charge of the DPS District with headquarters in Kingman, who decided when, where and how to conduct the operation. Lt. Tibbetts gave the approximately six police cars and twelve officers involved in each roadblock no instructions regarding the procedure to be followed. "They were not told what to do if a vehicle turned around to avoid the roadblock. They were not told whether to inspect visible cans or bottles. They were not told whether to shine flashlights in each vehicle that was stopped after dark. They were not told whether to smell inside each vehicle to detect the smell of alcohol." DPS placed pylons and lighted flares on the highway about 150 yards from the port-of-entry to channel all oncoming traffic into the roadblock. No warning signs or advance flashing lights announced the roadblock or its purpose, nor did DPS advise drivers in advance that roadblocks would be operated near Kingman on August 26, 1982 or September 6, 1982.

Drivers stopped at the roadblock were required to produce their driver's license and vehicle registration while DPS officials visually inspected the driver and the interior and exterior of his car. The officers looked for any indication of alcohol impairment including attempting to smell whether there was alcohol on the driver's breath or alcohol in the car, inspected visible cans and bottles, and shined flashlights into the interior and on the car's occupants. Vehicles were detained from 30–40 seconds to 5 minutes at the Kingman roadblocks. If the driver's papers were not in order or there was a need for further questioning or investigation, the car was referred to a secondary inspection point where delayed for a longer period of time. If the DPS official determined there was probable cause to believe a driver was driving while intoxicated, or evidence of some other statutory violation was discovered, the driver was arrested.

DPS estimates that 5,763 vehicles were stopped at a number of roadblocks in Arizona on September 6, 1982, and, as a result of those stops, fourteen persons were arrested for driving while intoxicated. Three of the fourteen were arrested at the Kingman roadblock. At the Kingman roadblocks on the two dates combined, DPS issued 13 DWI arrests, 71 license and registration citations, 33 warning and repair orders, 4 drug arrests, 4 liquor arrests, 3 misdemeanor arrests and one felony warrant arrest.

The parties agree that stopping an automobile and detaining its occupants constitutes a "seizure" within the meaning of the fourth and fourteenth amendments, even though such investigatory stop is brief and limited in purpose. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). "Both the Fourth Amendment to the Constitution of the United States and Article 2, § 8 of the Arizona Constitution, providing that 'No person shall be disturbed in his private affairs * * * without authority of law' protect travelers upon the public highways from harassment by government agents if

there is no basis to support a founded suspicion of criminal activity." *State v. Ochoa,* 112 Ariz. 582, 584, 544 P.2d 1097, 1099 (1976).

Whether the fourth amendment was violated by the Kingman roadblocks turns on whether a vehicle may be stopped at a temporary checkpoint for brief questioning of its occupants even though there is no reason to believe the driver is drunk. In *State v. Ochoa, supra,* we held that a police officer may not randomly stop the driver of a motor vehicle on a public highway in Arizona to check his vehicle registration and operator's license for the purpose of ascertaining whether he is violating the law. We noted a valid distinction between a stop made for the purpose of discovering a crime in the first instance and a stop made to investigate a crime already known to have been committed. "The former is unauthorized under the fourth amendment while the latter is permissible if it meets the test enunciated in *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968)." *State v. Axley,* 132 Ariz. 383, 390, 646 P.2d 268, 275 (1982). However, we did not reach the questions presented by a roadblock-type stop conducted for the purpose of ascertaining whether a crime has been or is being committed. *See State v. Graciano,* 134 Ariz. 35, 37 n. 2, 653 P.2d 683, 685 (1982).

To determine whether a particular law enforcement activity is permissible under the fourth amendment, the facts upon which the activity is based are measured against an objective standard such as probable cause or some other less stringent test. *Terry v. Ohio, supra,* 392 U.S. at 21–22, 88 S.Ct. at 1880. In deciding what objective standard is applicable, the United States Supreme Court has employed a balancing of interests technique which establishes the quantum of evidence necessary to justify certain distinct types of official action. This balancing of interests requires that the intrusion caused by the police conduct on an individual's fourth amendment interests be weighed against its promotion of legitimate government interests. "In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'" (citations omitted). *Delaware v. Prouse, supra,* 440 U.S. at 654–655, 99 S.Ct. at 1396–1397.

■ Two distinct lines of cases treat very limited kinds of searches or seizures as not unreasonable in circumstances short of probable cause. In *Terry v. Ohio, supra,* the Court held that a brief stopping for investigation requires a lesser quantum of evidence than an arrest. A "Terry" stop permits a police officer, in an appropriate manner, to conduct brief, unplanned, individualized encounters under circumstances giving rise to a reasonable suspicion that criminal activity may be afoot. "And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880.

Contemporaneously with *Terry,* the Court was confronted with another law enforcement activity, that of making a routine annual inspection of an apartment building without probable cause to believe the city housing code was being violated. *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). In determining the quantum of evidence necessary to sustain this activity, the Court concluded that the balance of interests precluded insistence upon some quantum of individualized suspicion because the need to search outweighed the invasion the search entailed. The Court held that reasonable standards based upon such factors as the passage of time, the nature of the building or the condition of the entire area would suffice to establish the right of inspection by warrant. "[T]he public interest demands that all dangerous conditions be prevented or abated, yet it is doubtful that any other canvassing technique would achieve acceptable results." *Id.* at 573, 87 S.Ct. at 1735. The three

factors relied upon by the Court are (1) the unique government and public interest in universal compliance with housing code standards; (2) the inability to accomplish an acceptable level of code enforcement under the traditional probable cause standard; and (3) the relatively minimal invasion of personal privacy and dignity attendant to periodic area inspection programs because the inspections are neither personal in nature nor aimed at the discovery of evidence of crime. *Id.*

With this background, the United States Supreme Court considered the legality of investigative stops of automobiles where the officer making the stop has neither probable cause nor reasonable suspicion to believe the car or its occupants are violating any applicable laws. In *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court addressed the practice of using roving patrols to stop cars to search for illegal aliens based upon criteria such as the apparent Mexican ancestry of the occupant. The Court concluded that even though the public interest in stemming the flow of illegal immigrants into the United States was substantial, the intrusion of roving patrols was too great. "[T]he nature of illegal alien traffic and the characteristics of smuggling operations tend to generate articulable grounds for identifying violators. Consequently, a requirement of reasonable suspicion for stops allows the government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference." *Id.* at 883, 95 S.Ct. at 2581. The Court then held that the balance of interests requires a reasonable suspicion for a roving patrol to stop a car.

In *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court found that the balance of interests tipped in favor of precluding insistence upon some quantum of evidence. The case involved a fixed checkpoint located away from the international border with Mexico, authorized by responsible officials, where cars were briefly stopped and the occupants questioned. The three factors

discussed in *Camara* were persuasive: the reasonableness of the procedures followed at the checkpoints made the intrusion minimal, the public interest in such checkpoints was found to be great, and "... the need for this enforcement technique is demonstrated by the records in the cases before us." *Id.* at 562, 96 S.Ct. at 3085. (The records before the Court indicated that in 1973 approximately 17,000 illegal aliens were apprehended at this checkpoint. *Id.* at 554, 96 S.Ct. at 3081). The crucial distinction between *United States v. Martinez-Fuerte, supra,* and *United States v. Brignoni-Ponce, supra,* is the lesser subjective intrusion ("the generating of concern or even fright on the part of lawful travelers") caused by a routine checkpoint stop than by roving patrols. *United States v. Martinez-Fuerte, supra,* 543 U.S. at 558, 96 S.Ct. at 3083.

In *Delaware v. Prouse, supra,* the Court recognized the state's vital interest in ensuring that licensing, registration and vehicle inspection requirements are being observed. However, the enormity of the intrusion of a program of roving spotchecking was found not sufficiently productive to justify the invasion upon fourth amendment interests. "Absent some empirical data to the contrary, it must be assumed that finding an unlicensed driver among those who commit traffic violations is a much more likely event then finding an unlicensed driver by choosing randomly from the entire universe of drivers." 440 U.S. at 659, 99 S.Ct. at 1399. In so holding, the Court stated that questioning all oncoming traffic at a roadblock-type stop might tip the balance of interests in favor of precluding a requirement of reasonable suspicion because a permanent checkpoint is less intrusive than random stops.

■ Applying the principles of these cases, our first step is to balance the public interest in roadblocks against the individual's fourth amendment interests. While a roadblock is, in theory, less intrusive than the roving patrols found impermissible in

*United States v. Prouse, supra,* and *United States v. Brignoni-Ponce, supra,* we cannot agree that the intrusion generated by the Kingman roadblocks was minimal. The record establishes that the Kingman checkpoints involved a not insubstantial amount of discretionary law enforcement activity and that the manner in which the roadblocks were operated was somewhat irregular. The roadblocks were set up at the discretion of a local highway patrolman and were operated without specific directions or guidelines. Officers were uncertain whether they should simply question the occupants of motor vehicles or whether they should seize the opportunity to cursorily search the vehicles for evidence of a violation. Motorists were taken by surprise, not having had prior notice of the location and purpose of the checkpoints. We find present in the Kingman operation the grave danger that such discretion might be abused by the officer in the field, a factor which caused the Court in *United States v. Prouse, supra,* much concern.

The state maintains that even if the intrusion is significant, such stops are reasonable under the fourth amendment because the public interest in apprehending drunk drivers outweighs the intrusion entailed. However, the record discloses no statistics concerning the extent of the problem of drunk drivers on Arizona highways nor does it indicate whether the Kingman roadblocks were more effective in dealing with the problem than the traditional roving patrols acting upon reasonable suspicion. We are well aware of the danger to life imposed by the drunk driver and we agree that the public has a substantial interest in ensuring that people who are inebriated do not operate vehicles on our highways. In the past, the foremost method of enforcing the DWI laws has been by observing how the person drives. The state has stipulated that "DPS officials, by observing and patrolling, regularly arrest drivers for DWI when there are no roadblocks. DPS officers are trained to detect drunk drivers on the road on the basis of observation. An experienced DPS officer becomes highly skilled at detecting drunk drivers by watching how a person drives. Without roadblocks, an experienced DPS officer can detect many drunk drivers."

By the foregoing quotation, we see that the state has in effect stipulated itself out of court. If there is an adequate method of enforcing the drunk driving statute, there is no pressing need for the use of an intrusive roadblock device. We have no empirical data in the record before us with which to weigh the reasonableness of the roadblock intrusion upon individual rights against the needs of the state.

It is apparent from the state's pleadings and oral argument that it hoped to sustain their position by asserting that roadblocks are permissible to check drivers' licenses and vehicle registrations; hence, drunk driving enforcement could be an incidental beneficiary. The record reflects that the state stipulated that the roadblocks were undertaken to enforce the provisions of the DWI laws. We cannot approve subterfuge even in a worthy cause. The roadblocks were for DWI enforcement; we therefore have addressed that issue and that issue alone.

The order of the lower court granting defendants' motions to suppress is affirmed. Relief denied.

HOLOHAN, C.J., and GORDON, V.C.J., concur.

FELDMAN, Justice, specially concurring.

I concur with the result and write only because I disagree with that portion of the opinion which holds that the record fails to establish sufficient grounds to uphold the use of a *properly instituted* roadblock.

The roadblocks in question were established for the purpose of discovering and apprehending drunk drivers. The rest of the reasons given for the roadblock, such as administrative enforcement of driver's licensing and registration laws, were obviously ideas intended as camouflage or support for the true purpose of the stops. In my view, the state would have been in a better position if it had faced the problem square-

ly and established the roadblocks in a manner designed to achieve their true purpose, and nothing else. It then could have argued the importance of the roadblocks as a *deterrent* designed to keep drunk drivers off the roads on the Labor Day weekend.

I agree with the majority that the roadblocks in question constitute a seizure under the fourth amendment. That amendment, prohibiting "unreasonable searches and seizures," "imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez-Fuerte,* 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976). "In delineating the constitutional safeguards applicable in particular contexts, the [Supreme] Court has weighed the public interest against the Fourth Amendment interest of the individual." *Id.* at 555, 96 S.Ct. at 3081. Arrests require probable cause to believe the person being arrested has committed a crime. Seizures short of arrest may be made on lesser grounds, but usually require "some quantum of individualized suspicion," *id.* at 561, 96 S.Ct. at 3084, most often a founded suspicion based upon articulable facts that the person being arrested is or has engaged in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *State v. Graciano,* 134 Ariz. 35, 37, 653 P.2d 683, 685 (1982).

The *Terry* exception to the probable cause requirement will not support the stops made in the instant cases because the roadblock stopped everyone—whether there was a founded suspicion or not. The issue here, therefore, is whether the fourth amendment permits officers to stop and question persons whose conduct is innocent, unremarkable and free from suspicion.

The question has frightening implications. The thought that an American can be compelled to "show his papers" before exercising his right to walk the streets, drive the highways or board the trains is repugnant to American institutions and ideals. If roadblocks can be maintained to stop all persons, regardless of how innocent

their conduct, for the purpose of investigating or apprehending drunk drivers, then presumably similar stops of all citizens could be undertaken for questioning and surveillance with regard to other crimes, such as possession of narcotics, possession of stolen property or burglary. It might be argued that if the law did permit such stops, we would have less crime. Nevertheless, our system is based on the idea that the risk of criminal activity is less of a danger than the risk of unfettered interference with personal liberty. The concept was succinctly expressed by a newspaper columnist who recently used these words in describing his opposition to roadblock stops for apprehension of drunk drivers:

I . . . have often thought that getting killed by some intoxicated idiot who crossed the median divider and hit me head-on would be the worst and most senseless way to die.

I mourn for the parents of children who have died at the hands of drunk drivers. But none of this makes a police state acceptable. Freedom doesn't come risk-free. I'm willing to take some risks in exchange for my freedom.

Andy Rooney, *Roadblocks for Drunk Drivers Nibble Away at Our Freedoms,* Chicago Tribune, *reprinted in* The Arizona Republic, April 4, 1983, at A7.

These words reflect the spirit of the general rule that stop and seizure involves so serious an interference with personal liberty that it should not be permitted in a free society absent a founded suspicion of criminal conduct. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). However, "the Fourth Amendment imposes no irreducible requirement of [individualized] suspicion." *Martinez-Fuerte,* 428 U.S. at 561, 96 S.Ct. at 3084. While the balancing of public and private interests usually makes individualized suspicion a prerequisite to a constitutional search or seizure, several examples of reasonable searches and seizures based on a standard other than individualized suspicion can be noted. As the majority indicates, one such exception has been enforcement of building codes

through the inspection of premises. *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Another recognized exception is the use of roadblock-type stops of all vehicles to enforce the immigration laws. *United States v. Martinez-Fuerte, supra.* A third exception involves airport stops and searches. The luggage check and metal detection procedure with which we are all now familiar is an interference in personal liberty and is, therefore, a search under the fourth amendment. *See United States v. Davis,* 482 F.2d 893 (9th Cir.1973). Nevertheless, all persons are subjected to that process, even though there is no founded suspicion that they are engaged in criminal activity, because the need for inspection is urgent, the potential damage is great and there are few, if any, reasonable alternatives. Thus, a non-discriminatory, non-discretionary search of prospective travelers' luggage by X-ray and their bodies by metal detectors has been sustained as reasonable under the fourth amendment. *See id.* at 910–912; *United States v. Epperson,* 454 F.2d 769 (4th Cir.1972), *cert. denied,* 406 U.S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972).

An excellent review of the problem is contained in Professor LaFave's work on search and seizure:

> It may well be, however, that a roadblock for general enforcement purposes, if it involves nothing more than questioning of the occupants of the vehicle stopped, will be upheld under some circumstances. The Supreme Court has upheld the use of "reasonably located checkpoints" for the purpose of questioning vehicle occupants to determine whether they are illegal aliens [citing *United States v. Martinez-Fuerte, supra* ] (but not to search the vehicles for such aliens), and has also indicated that "questioning of all oncoming traffic at roadblock-type stops" would be a lawful means of checking drivers' licenses and vehicle registrations. [Citing *Delaware v. Prouse, supra.*] Those cases, however, are grounded on the balancing test of *Camara v. Municipal Court* and a determination that, as in *Camara,* the particular government interests involved could not be adequately protected if an individualized reasonable suspicion test were applicable. This being so, it cannot be assumed that those cases inevitably carry over to roadblocks conducted for more ordinary or traditional investigative purposes. But more recently, in *Brown v. Texas,* [443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ] the Court cited those decisions in declaring, in the context of assessing a stopping for a narcotics investigation, that such a seizure must be upon reasonable, individualized suspicion *or* "must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." This suggests that a roadblock conducted in conformance with such a plan might pass Fourth Amendment muster even when not directed at the apprehension of the perpetrator of a specific recent and most serious crime.

3 W. LaFave, *Search and Seizure* § 9.5 at 63–64 (Supp.1983).

It is here that I depart from the reasoning of the majority. Applying the balancing test of *Camara v. Municipal Court* and of *United States v. Martinez-Fuerte, supra,* I believe that we are able to hold that a properly conducted roadblock stop without founded suspicion is permitted by the fourth amendment when used for deterrent purposes rather than traditional investigatory purposes. I reach this conclusion upon weighing the factors mentioned by the Supreme Court in *Camara* and *Martinez-Fuerte.*

First, we must consider the purpose of the intrusive conduct. *United States v. Munoz,* 701 F.2d 1293, 1299 (9th Cir., March 22, 1983). The governmental interest sought to be protected by the roadblocks is greater than merely detecting and apprehending drunk drivers. Given the carnage on our highways, there is a unique societal interest in enforcing compliance with the

8

law by deterring driving while under the influence of alcohol or other drugs.[1]

Second, the state cannot satisfy this interest by traditional methods which satisfy the *Terry* test. The traditional system has left us far short of achieving the law's objective. While the state necessarily stipulates that training and experience enable police officers to recognize and apprehend many inebriated drivers upon founded suspicion, I do not believe that this "stipulates the state out of court." It is only fortuitous that an officer happens to be in a position to see a drunk entering the freeway on the off-ramp before that drunk happens to kill some innocent person. We are not likely ever to achieve the situation where there will be police officers available at closing time on a Labor Day weekend night at each of the locations where patrons shuffle from their favorite saloon to the parking lot, nor, I think, would we ever desire to have that many officers available.

While the majority indicates "the record discloses no statistics concerning the extent of the problem of drunk drivers on Arizona highways" (at 996), I believe that readily available statistics provide us with information of which we may take judicial notice.[2] In a statement made before the United States Senate Subcommittee on Surface Transportation in 1982, the Deputy Administrator of the National Highway Traffic Safety Administration stated: "Over the past 10 years the number of persons killed on our highways in motor vehicle accidents involving alcohol has averaged 25,000 per year. In 1980, over 650,000 people were injured in accidents involving alcohol." *Federal Legislation to Combat Drunk Driving Including National Driver Register: Hearing on S. 671, S. 672, S. 2158 Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science & Transportation,* 97th Cong., 2nd Sess. 65 (1982). Between 40 and 55% of drivers who are fatally injured have alcohol concentrations in their blood above the legal limit and this figure rises to 55 to 65% in single-vehicle crashes. *Alcohol, Drugs & Driving: Hearing to Examine What Effect Alcohol & Drugs Have on Individuals While Driving Before the Subcomm. on Alcoholism & Drug Abuse of the Senate Comm. on Labor & Human Resources,* 97th Cong., 2nd Sess. 1 (1982). Furthermore, it has been estimated that one out of every 50 drivers on the road has a blood-alcohol content of .10 or higher; on Friday and Saturday nights, one out of 10 drivers is drunk. *Hearing Before the Subcomm. on Surface Transportation, supra* at 112. However, "only 1 of every 2,000 drinking drivers is caught daily, while 70 [people] are killed." *Id.* at 55. Many of those killed or injured are innocent victims of drunk drivers. Arizonans are no less in jeopardy than those in other states. The National Institute of Alcohol Abuse and Alcoholism reports that Arizona ranks fourth highest among the states in the proportionate number of casualties associated with drinking problems. *Alcohol Problems Seem to be More Widespread in the West,* The Wall Street Journal, January 25, 1983, at 25. These statistics make it obvious that traditional law enforcement methods, involving the arrest by roving officers of only those whom they can stop upon a founded suspicion of drunk driving, fall short of satisfying society's compelling interest in enforcing compliance with the laws prohibiting drunk driving.[3]

1. This factor highlights the difference between drunk driving and other types of crime involving motor vehicles. No doubt roadblocks would be useful in enforcing compliance with the laws concerning joyriding, stolen vehicles, driving with improper equipment and the like. However, society's interest in law enforcement respecting these crimes is not of the same weight as its interest in ending the death and injury which result from the mix of alcohol and gasoline; the weight of the competing interests enters into the decision because the fourth amendment forbids only "unreasonable" search and seizure.

2. In *Noland v. Wootan,* 102 Ariz. 192, 193, 427 P.2d 143, 144 (1967), we did "take judicial notice of the terrible toll taken by drivers who mix alcohol and gasoline."

3. One might argue that the recently enacted statutes (A.R.S. § 28–692 to –692.02) increasing punishment for driving while intoxicated would provide a sufficient deterrent, without

This being so, more intrusive methods may be considered reasonable. *See Delaware v. Prouse,* 440 U.S. at 659, 99 S.Ct. at 1399.

Third, the roadblock method can be planned and operated so that it requires only a relatively minimal invasion of personal liberty, privacy and dignity. *United States v. Martinez-Fuerte,* 428 U.S. at 559, 96 S.Ct. at 3083. In reaching this conclusion, I do not minimize the intrusion. Being stopped and questioned by police officers while exercising one's lawful rights is a substantial infringement upon liberty of movement. Nevertheless, the serious dangers involved in airplane hijacking and bomb incidents have compelled us to accept some degree of restraint upon personal liberty when we exercise our right to move through the airport and board an airplane. An occasional stop at a roadblock for minimal questioning and visual inspection—not search—may well be the price which we have to pay to enforce compliance with the law and rid ourselves of the presently intolerable danger created by drunk drivers. In my view, therefore, limited infringement on personal movement in this situation is reasonable and thus permitted by the fourth amendment. However, even though the danger is great and enforcement alternatives ineffective, the intrusion on personal liberty must be kept to a minimum by being "carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown v. Texas,* 443 U.S. at 51, 96 S.Ct. at 2640.

It is at this point that I must rejoin the majority, because the roadblocks under consideration here do not pass such a test. The record before us does not indicate that the roadblocks in question were established by any plan formulated or approved by executive-level officers of the law enforcement agencies involved. *See Balelo v. Baldridge,* —— F.2d ——, ——, No. 81–5806 (9th Cir., Jan. 5, 1983). No standards were provided with regard to time, place and the number of officers required to make sure delays were held to a minimum and the roadblocks instituted at times and places where they would be most effective to deter drunk drivers. No procedural rules or regulations or instructions were given the individual officers or their immediate supervisors. Procedures to be followed in stopping vehicles and questioning their occupants were left to the discretion of the lower level officers; they could and did vary from roadblock to roadblock. No doubt as a result, the record before us indicates the use of methods which would be doubtful in seizure of a person stopped on a founded suspicion of criminal activity, and which are certainly highly inappropriate for a stop of someone whose conduct provided the officer with no grounds for suspicion. For instance, the record indicates that the officers did not explain the purpose of the roadblock or stop to occupants of vehicles. Worse, the officers refused to answer questions regarding the reason for the stop. Searches were made, some, no doubt, without probable cause. Officers present included those not even assigned to traffic enforcement duty. The record is replete with other details of improper operation. It is unnecessary to recount them; the requirements of explicit, neutral limitations on the conduct of officers is explained in *Martinez-Fuerte, supra.*

Thus, I join in the court's conclusion that the stop of each vehicle at these roadblocks violated the fourth amendment and was illegal. The subsequent discovery of probable cause for the arrest of the three defend-

infringing upon the liberty of innocent persons. The problem is that deterrence by punishment is often ineffective unless combined with a fear of apprehension. The same comment could, of course, be made with regard to all other crimes, but almost all other crimes can be distinguished. In drunk driving it is the very presence of the vehicle on the road which is the object to be prevented and the single thing most effectively accomplished by roadblocks. In narcotics enforcement, on the other hand, there is no assurance that roadblocks would prevent possession or sale, and there is no method of enforcement except by search of the person and vehicle itself. In my opinion, this involves too great an infringement on personal liberty. The deterrent roadblock for drunk driving would, however, force the car off the road or prevent it coming on the road, thus meeting the law enforcement objective with a very minimal infringement on personal liberty.

ants in question in this case is tainted by that illegality. I maintain, however, that the fourth amendment would allow properly planned and operated roadblocks established for deterrent rather than investigative or apprehension purposes; the object would be to enforce compliance with the laws prohibiting driving under the influence of alcohol or drugs by deterring such people from going upon the highway at all. Possible penal consequences would be only incidental and secondary. *See United States v. Munoz,* 701 F.2d at 1299.

I acknowledge that the effect of the roadblock is often the same whether it be placed for deterrence or investigation,[4] but that there are some significant differences which are the natural result of the difference in purpose. For instance, roadblocks placed for deterrence should be instituted at times and locations based upon the need to supplement random investigatory stops with measures designed to keep drunken drivers from using heavily traveled highways at all. Next, the efficacy of a deterrent roadblock is heightened by advance publicity in the media and on the highways. Such publicity would warn those using the highways that they might expect to find roadblocks designed to check for sobriety; the warning may well decrease the chance of apprehending "ordinary" criminals, but should certainly have a considerable deterring effect by either dissuading people from taking "one more for the road," persuading them to drink at home, or inducing them to take taxicabs. Any one of these goals, if achieved, would have the salutary effect of interfering with the lethal combination of alcohol and gasoline. Advance notice would limit intrusion upon personal dignity and security because those being stopped would anticipate and understand what was happening. *See Martinez-Fuerte,* 428 U.S. at 558, 96 S.Ct. at 3083; *United States v. Davis,* 482 F.2d at 914. For these reasons, roadblock stops are less intrusive than in-

vestigatory stops by roving officers. *United States v. Munoz,* 701 F.2d at 1297.

In conclusion, therefore, drawing a balance between an individual's right of personal liberty and the urgent public interest in enforcement of the drunk driving laws, I would permit the use of administratively planned and properly operated roadblocks for deterrent purposes in situations, like the one before us, where problems unique to motor vehicles render traditional methods of law enforcement ineffective. Even when so planned and designed, such roadblocks should be operated in a manner calculated in advance to provide the least possible intrusion into the public's freedom and sense of security. Methods to achieve this are suggested in *United States v. Martinez-Fuerte, supra,* and should be observed. In my view, the roadblocks in the case before us were investigatory in nature and operated as though the officers were exercising some right of apprehension. While there may be intimations in *Brown v. Texas, supra,* that investigatory roadblocks are proper, I would hold that under the Arizona Constitution, art. 2, § 8,[5] they are not, even if the United States Supreme Court should allow them under the fourth amendment to the United States Constitution.

I join in the holding that the order of the lower court granting defendant's motions to suppress should be affirmed.

CAMERON, Justice, concurring.

I concur in the opinion of Justice Feldman, except the strict distinction drawn between the investigatory and deterrence purposes of this enforcement activity.

---

4. Obviously, a stop for the purpose of questioning and visual inspection regarding sobriety may lead to particularized suspicion justifying further police action in some cases.

5. "No person shall be disturbed in his private affairs, ... without authority of law."