NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellant*,

*v.*

GLEN RAY ROBERTSON, *Appellee*.

No. 1 CA-CR 23-0026
FILED 06-11-2024

Appeal from the Superior Court in Maricopa County
No. CR2021-001295-001
The Honorable Michael C. Blair, Judge

**AFFIRMED**

COUNSEL

Maricopa County Attorney's Office, Phoenix
By Robert A. Walsh, James H. Baumann
*Counsel for Appellant*

Maricopa County Public Defender's Office, Phoenix
By Jesse Finn Turner
*Counsel for Appellee*

---

## MEMORANDUM DECISION

Presiding Judge Anni Hill Foster delivered the decision of the Court, in which Judge Brian Y. Furuya and Vice Chief Judge Randall M. Howe joined.

---

**F O S T E R**, Judge:

**¶1**        The State of Arizona appeals the trial court's grant of Glen Robertson's motion to suppress evidence of a blood draw that showed Robertson had a blood alcohol content of .195. The trial court ruled that the police officer lacked reasonable suspicion that Robertson was driving under the influence. Because this Court reviews *de novo* whether the undisputed facts constitute reasonable suspicion, this Court holds that the police officer did not articulate reasonable suspicion justifying the detention of Robertson. This Court affirms.

### FACTS AND PROCEDURAL HISTORY

**¶2**        On June 25, 2020, at approximately 8:24 p.m., the Phoenix Police Department received a call from a driver, A.C., reporting a hit-and-run involving her Honda Odyssey and a silver mid-2000s Chevrolet Avalanche. A.C. described the license plate of the Avalanche as containing the alphanumeric sequence "B546."

**¶3**        While speaking with police, A.C. followed the Avalanche to a liquor store, where she reported that the vehicle pulled into the parking lot, and she observed two black males exiting the vehicle. A.C. described the passenger wearing a light-colored tank top; no information was given about the driver's attire. Per police warnings, she did not approach; she performed a U-turn, and proceeded to park across the street; she briefly lost sight of the Avalanche.

**¶4**        Shortly thereafter, Officer Cartmill arrived and approached A.C. At 8:29 p.m., A.C. informed Officer Cartmill that the Avalanche was in the drive-through line at the liquor store. Officer Cartmill reported the vehicles' updated location over the radio. Officer Cartmill also reported having observed "very minor damage" that might not be enough to "make a report."

¶5            Soon after, Officer Rivas arrived on scene and noticed a gray Avalanche in the drive-through line ("Avalanche D"). He did not approach Avalanche D in the drive-through. Instead, Officer Rivas's attention turned to a shirtless black man holding a bottle of vodka, who made a joking remark towards Officer Rivas. He later learned this man was Justin Proctor. No longer focused on the Avalanche in the drive-through, Officer Rivas noted Proctor was standing near an opened front passenger door of another gray Avalanche ("Avalanche P") located in the parking lot of the liquor store.

¶6            Proctor began walking towards Officer Rivas' SUV without first closing the front passenger door of Avalanche P or removing the keys from its ignition. Officer Rivas then asked Proctor, "what type of vehicle he was standing next to." Proctor ignored him, turned away, and started walking eastbound on the sidewalk along McDowell Road. As Proctor walked away, Officer Rivas ran a license search on Avalanche P's temporary tag numbered 'V5A6AVA.' But the initial results came up incomplete, prompting Rivas to believe that Avalanche P might have been stolen. He parked behind the vehicle, preventing it from leaving.

¶7            Officer Rivas started to follow Proctor on foot. Walking by Avalanche P, he looked through the window and did not see anyone sitting behind the steering wheel or otherwise occupying the vehicle. He also never observed its driver's door being opened, nor did he see any other black male in the vicinity besides Proctor. While following Proctor, Officer Rivas said "hey boss," in an attempt to speak with him, but Proctor continued to walk away and threw a bottle of alcohol into a nearby bush. Unsure that Proctor heard him, Officer Rivas continued to follow Proctor.

¶8            Soon, another black male, Robertson, appeared and began walking near Proctor, heading in the same direction. This was the first time Officer Rivas saw another black male in the area. Officer Rivas noted that Robertson and Proctor were the only black males he saw in the area, but he also did not investigate any other vehicles. As Robertson and Proctor were walking away from the parking lot, the police dispatcher reported that Avalanche P, which Proctor had been standing next to, was not stolen and identified its registered owner.

¶9            Meanwhile, Sergeant Moskop arrived on the scene, where he observed Proctor and Robertson walking a few feet apart. Simultaneously, he overheard Officer Rivas broadcasting his intention to stop Proctor over the radio. Robertson and Proctor proceeded to cross the street. Sergeant Moskop pulled his SUV over, activated his lights and shouted, "hey, stop!"

Both men continued walking east. Sergeant Moskop then pulled his SUV onto the sidewalk, intending to stop the two men. The men turned and began jaywalking across the street, at which point Officer Rivas apprehended Proctor. Officer Rivas testified that when he apprehended Proctor, he had no reasonable suspicion that Robertson was involved in any way with Avalanche P or Proctor.

¶10 Robertson, who was a few steps ahead of Proctor, turned and yelled at Officer Rivas to let go of his "brother." Robertson took a few steps toward Officer Rivas, coming within 10 to 15 feet of him; Officer Rivas became momentarily distracted. Officer Rivas testified that Robertson's actions constituted "interference" with Proctor's arrest and justified Robertson's detention.

¶11 Simultaneously, Sergeant Moskop saw Officer Rivas detaining Proctor on the ground and placed himself between Officer Rivas and Robertson, who was chanting "Black Lives Matter" while swinging his hand up and down. Sergeant Moskop ordered him to "get back" and then to "get down on the ground." Robertson started to back up. As Robertson turned to walk away, Sergeant Moskop tackled him to the ground. Soon Officer Cartmill arrived and handcuffed Robertson.

¶12 Upon returning to the liquor store, A.C., for the first time, identified Robertson as the driver of Avalanche P. Having smelled alcohol on Robertson's breath, Sergeant Moskop placed Robertson under arrest for "resisting arrest," "DUI," and "the traffic infractions as well."

¶13 Robertson was subsequently charged with an aggravated DUI, based on blood test results indicating the presence of THC, a THC metabolite, and a 0.195% blood alcohol content within two hours of driving. Robertson moved to suppress the blood evidence, citing a Fourth Amendment violation resulting from a purported illegal detention and arrest. The court granted Robertson's motion to suppress, finding the stop and manner of detention was unreasonable. The State then successfully moved to dismiss the case without prejudice and timely filed a notice of appeal. This Court has jurisdiction pursuant to Article VI, Section 9, of the Arizona Constitution and A.R.S. §§ 12–120.21(A)(1), 13-4031, and 13-4032(6).

**DISCUSSION**

¶14 The State argues that the trial court erred by granting Robertson's motion to suppress evidence of his blood alcohol content based on an alleged Fourth Amendment violation. This Court "review[s] a trial

court's ruling on a motion to suppress for an abuse of discretion." *State v. Peterson*, 228 Ariz. 405, 407, ¶ 6 (App. 2011).

**¶15**       "In reviewing the grant of a motion to suppress, [this Court] view[s] the evidence presented at the evidentiary hearing and any reasonable inferences from that evidence, in the light most favorable to upholding the trial court's order." *State v. Garcia-Navarro*, 224 Ariz. 38, 39, ¶ 2 (App. 2010). "Evidence derived from a stop not based on reasonable suspicion is 'fruit of the poisonous tree' and must be suppressed." *State v. Fornof*, 218 Ariz. 74, 76, ¶ 5 (App. 2008).

**¶16**       The State argues that the court made two errors. First, the court erred by finding that the officers did not have reasonable suspicion to stop and question Robertson and second, that Robertson's detention was unconstitutional. The Fourth Amendment guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. An officer's investigatory stop implicates the Fourth Amendment when it qualifies as a seizure. *State v. Serna*, 235 Ariz. 270, 273, ¶ 12 (2014). A seizure occurs when a person's freedom of movement is restricted to such an extent that a reasonable person would believe they are not free to leave, often brought about by physical force or a show of authority. *Id.*; *see also United States v. Mendenhall*, 446 U.S. 544, 552 (1980).

## I.    The Officers Lacked Reasonable Suspicion for an Initial Stop.

**¶17**       The State argues that the trial court erred by ruling that Sergeant Moskop did not have reasonable suspicion to stop Robertson. This Court reviews *de novo* whether the police had reasonable suspicion to justify an investigatory stop, *State v. Rogers*, 186 Ariz. 508, 510 (1996), but defers to the trial court's findings of fact and gives due weight to inferences drawn from those facts by local law enforcement officers, *Ornelas v. United States*, 517 U.S. 690, 699 (1996). A police officer with a reasonable and articulable suspicion that a person is involved in criminal activity may make a limited investigative stop without implicating the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). Law enforcement may stop a person "to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Hayes v. Florida*, 470 U.S. 811, 816 (1985). "A 'Terry' stop permits a police officer, in an appropriate manner, to conduct brief, unplanned, individualized encounters under circumstances giving rise to a reasonable suspicion that criminal activity may be afoot" *and the subject may have been involved in the criminal conduct. State ex rel. Ekstrom v. Just. Ct. of State of Ariz. in & for Kingman Precinct No. 1*, 136 Ariz. 1, 3 (1983). The reasonable suspicion standard falls short of probable cause and

requires only a "minimal level of objective justification," exceeding a mere hunch but much less than proof of wrongdoing by a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

¶18 "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *State v. Blackmore*, 186 Ariz. 630, 633 (1996) (quoting *Terry*, 392 U.S. at 21). The "assessment of reasonable suspicion is based on the totality of the circumstances, considering such objective factors as the suspect's conduct and appearance, location, and surrounding circumstances, such as the time of day." *Fornof*, 218 Ariz. at 76, ¶ 6. Also, it considers "the officer's relevant experience, training, and knowledge." *Id.* This view permits officers to draw on their specialized training—as well as their commonsense knowledge about human behavior—to form their particularized and articulable basis for a stop. *State v. Teagle*, 217 Ariz. 17, 24, ¶ 26 (App. 2007).

¶19 Here, the record demonstrates that though the officers had information indicating a specific vehicle was involved in a hit-and-run accident, they lacked the required *particularized* information to support reasonable suspicion that Robertson was the one behind the wheel of that vehicle. The officers on the scene were aware of certain facts: an alleged hit-and-run incident had occurred involving an Avalanche and two black males. However, no one saw Robertson until Sergeant Moskop arrived and beamed his lights on him at which point Robertson had not been tied to the Avalanche. At that point, nothing suggested he had committed a crime.

¶20 The State contends that Robertson's actions were suspicious as he emerged unexpectedly, began tailing Proctor, and, when Sergeant Moskop illuminated him with his lights, Robertson glanced over his shoulder before continuing to walk away. But courts have determined that such behavior is not by itself suspicious. *See Rogers*, 186 Ariz. at 509 (two men emerging from behind some bushes in a darkened residential area, walking down the middle of the street, and staring at officers was not suspicious conduct); *see also State v. Stricklin*, 191 Ariz. 245, 246 (App. 1996) (a man standing next to a closed gas station and peering around the corner, as if he was trying to hide, was not considered suspicious conduct). Also, "[t]he mere act of looking at and walking away from a police officer does not give rise to reasonable suspicion to stop and detain a person" without additional information. *State v. Wyman*, 197 Ariz. 10, 13, ¶ 6 (App. 2000). Robertson's actions without more did not give rise to reasonable suspicion that he was involved in the hit-and-run.

6

**¶21**　　　　The State further argues that the officers at the scene witnessed events that collectively furnished reasonable suspicion that Robertson was the driver of the Avalanche and therefore committed the crime violating A.R.S. § 28-662(A). "Reasonable suspicion can be based on the collective knowledge of the officers involved in an investigation." *State v. Majalca*, 251 Ariz. 325, 330, ¶ 20 (App. 2021). A "[p]olice officer[] may 'stop and detain' any person for an actual or suspected violation of Title 28" (i.e., the Arizona traffic code), *State v. Fikes*, 228 Ariz. 389, 390, ¶ 4 (App. 2011) (citing A.R.S. § 28-1594), so long as the officer's suspicion that the person has committed the traffic violation is "articulable" and "reasonable" *State v. Salcido*, 238 Ariz. 461, 464, ¶ 7 (App. 2015).

**¶22**　　　　Here, the officer's suspicion was neither articulable nor reasonable, as they had no information to tie Robertson to the Avalanche until *after* he was arrested. Prior to Robertson's arrest, nothing established that something illegal was occurring, other than the call from A.C. From the time of the call from A.C., officers received only limited, incomplete, and contradictory information that could not sustain reasonable suspicion as to Robertson's involvement with the hit-and-run.

**¶23**　　　　Officer Cartmill reported over the radio that she questioned whether she had enough evidence to report a hit-and-run at all. Such an assessment diminishes any objective belief that a crime had been committed at all. Indeed, Officer Rivas did not at first believe Robertson was involved while he was detaining Proctor.

**¶24**　　　　Further, the officers had no information upon which to ground their identification of Robertson as a suspect except that two black males were involved. Thus, the officers' only connection between Robertson and Proctor was their race and that they were walking near—but not beside—each other. While race identification can be used as part of a suspect identification, race alone is an insufficient basis to develop reasonable suspicion. *See State v. Kuhn*, 517 A.2d 162, 165 (N.J. Super. Ct. App. Div. 1986) ("No rational inference may be drawn from the race of [a person] that he may be engaged in criminal activities.").

**¶25**　　　　Further, A.C. informed Officer Cartmill that the vehicle involved in the incident was at the drive-through location, which Officer Cartmill then reported via radio. But this undermines the State's argument that Avalanche P, located not in the drive-through, but in the parking lot, was the suspected hit-and-run vehicle. Though Officer Rivas initially believed that Avalanche P was stolen, Sergeant Moskop testified that this belief was a hunch and was quickly disproved when the police dispatcher

radioed that it was not stolen. It was this incorrect belief, combined with his observing Proctor standing near Avalanche P, that caught Officer Rivas's attention and prompted him to initiate the detention at issue. But as noted, more than a hunch is required for reasonable suspicion. *Teagle*, 217 Ariz. at 24, ¶ 26.

¶26 The State contends that A.C. was a reliable witness, giving the officers a reasonable belief that the information given to them was accurate, and thus qualifying as a sufficient basis for reasonable suspicion to detain Robertson. It cites *State v. Harris* for the proposition that "a non-professional citizen informant is presumed to be reliable," 131 Ariz. 488, 490 (App. 1982), and argues that A.C. provided credible information to the police. But A.C.'s credibility is not dispositive to this Court's inquiry. Rather, when officers exclusively use a third-party's report of suspected criminal activity as the basis of their reasonable suspicion to perform an investigatory detention, "*that report* must possess sufficient indicia of reliability." *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 (9th Cir. 2003) (emphasis added). When evaluating whether a third-party's report bears sufficient indicia of reliability, the reporting party's credibility may be one part of that equation. But a party's credibility is not synonymous with reliability of the report itself.

¶27 While no one argued during the hearing that A.C. was an unreliable witness, Robertson highlighted in his briefs that the information A.C. provided to the police was incorrect and inconsistent. For instance, A.C. reported a license plate that did not match Avalanche P—though some of the numbers she identified were on the vehicle's temporary tag. She also used the term "plate" rather than indicating it was a temporary paper tag. The passenger's attire she described did not match that of Proctor, and she identified two distinct vehicles—Avalanche P in the parking lot and then Avalanche D in the drive-through—that created confusion as to which vehicle was involved in the hit-and-run. This fluid information was disseminated over the radio, updating the officers on the scene that the original details they received were not accurate, or at a minimum needed further investigation. But neither Officer Rivas nor Sergeant Moskop verified the details regarding Avalanche D, the vehicle A.C. claimed hit her. Instead, they focused on Avalanche P to pursue Proctor as a suspect.

¶28 Examining the totality of the circumstances, the officers had insufficient bases to form reasonable suspicion sufficient to justify Robertson's detention.

## II. The Detention Amounted to an Arrest.

¶29 The State argues that Robertson's arrest was lawful and did not infringe upon his constitutional rights because it is justified as a *Terry* stop. "Whether an illegal arrest occurred is a mixed question of fact and law that [this Court] review[s] de novo." *State v. Boteo-Flores*, 230 Ariz. 105, 107, ¶ 11 (2012) (internal quotations and citation omitted).

¶30 An officer must have probable cause to make an arrest. *State v. Richards*, 110 Ariz. 290, 291 (1974). "Probable cause exists whe[n] the arresting officers have reasonably trustworthy information of facts and circumstances which are sufficient . . . to lead a reasonable [person] to believe [a crime was] committed." *Id.* The State argues that Robertson's chanting constituted interference with the arrest of Proctor and therefore gave the officers probable cause to detain him. This Court disagrees.

¶31 Non-threatening speech, devoid of physical force, is only punishable if it substantially incites unlawful resistance or significantly interferes with the execution of official duties. *State v. Tages*, 10 Ariz. App. 127, 130 (1969). "A person commits resisting arrest by intentionally preventing or attempting to prevent a person reasonably known to him to be a peace officer . . . from effecting an arrest by . . . using or threatening to use physical force against the peace officer or another." A.R.S. § 13–2508(A)(1). "Physical force" is defined, in relevant part, as "force used upon or directed toward the body of another person." A.R.S. § 13–105(32).

¶32 Robertson, despite being within proximity to Officer Rivas, attempted to comply with Sergeant Moskop's commands to move away from the two individuals once instructed to step back. But Sergeant Moskop did not provide an opportunity for Robertson to comply before tackling him. Without providing an opportunity for Robertson to comply with the command to move away, Sergeant Moskop did not have probable cause to arrest Robertson.

¶33 In finding the stop and arrest were improper, this Court finds that the evidence derived from the arrest was improperly seized. The trial court did not abuse its discretion in granting the motion to suppress.

## CONCLUSION

¶34      For the foregoing reasons, this Court affirms the trial court's order granting Robertson's motion to suppress.



AMY M. WOOD • Clerk of the Court
FILED:   AGFV