**David Edward HIGBIE, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 194–87.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 11, 1989.

Rehearing Denied Nov. 22, 1989.

Tex McConathy, Dallas, for appellant.

Henry Wade, Former Dist. Atty., John Vance, Dist. Atty., Michael A. Klein, Former Asst. Dist. Atty., William Randell Johnson, Elizabeth Hardeman, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., and Alfred Walker, First Asst. State's Atty., Austin, for the State.

## OPINION ON STATE'S PETITION FOR DISCRETIONARY REVIEW

MILLER, Judge.

Appellant was convicted of driving while intoxicated, a misdemeanor, in violation of Art. 6701*l*–1 V.A.C.S. and sentenced to 60 days in jail, probated for 24 months, and assessed a $350 fine. The Dallas Court of Appeals reversed and remanded, holding that the trial court should have suppressed evidence of appellant's intoxication because it was the fruit of an illegal stop. 723 S.W.2d 802. We granted State's Petition for Discretionary Review to determine whether the Court of Appeals substituted itself as the fact-finder, and whether it erred in holding that the roadblock was violative of the Fourth Amendment. We will affirm the Court of Appeals.

Appellant requested and received a hearing on a motion to suppress evidence concerning intoxication taken as a result of the roadblock. At the hearing Officer Carter, a member of the Dallas Police DWI Task Force, testified that under orders from their supervisors he and other members of the DWI Task Force established a roadblock at the 5800 block of Beltline Road in Dallas. Officer Carter stated that he had been instructed to conduct a roadblock for the purpose of checking driver's licenses.

During cross-examination, defense counsel elicited from Carter that in the area of the roadblock there were bars one-half to three quarters of a mile down the road and one just a quarter of a mile down the road from the roadblock. The roadblock was established between 1:30–1:45 a.m., just before the bars closed at 2:00 a.m. The roadblock stopped only eastbound traffic traveling away from the bars into a residential area, however, traffic coming out of the residential area was not subject to the roadblock. Carter stated that "most" of the officers at the roadblock were members

of the DWI Task Force. The officers subjected every car to the stop allowing the motorists to proceed only after they produced a valid driver's license and the questioning officer had no suspicion that the driver may be intoxicated. Carter further testified that neither he nor any other officer, to his knowledge, actually wrote a citation for driving without a license during that particular night's roadblock.

At the close of this testimony the trial judge denied appellant's motion to suppress any evidence of intoxication against appellant. Appellant subsequently entered a plea of nolo contendre to the trial court and was found guilty of DWI by the trial judge. The Dallas Court of Appeals reversed appellant's conviction finding that it was a result of evidence ascertained at an illegal stop.

I

■ The State, in its first ground for review, asserts that the Court of Appeals improperly substituted itself as the factfinder. Specifically, the State is implicitly challenging the authority of the Courts of Appeals, as in this instance, to review the totality of evidence presented to the trial judge at a suppression hearing and determine whether a rational trier of fact has made a conclusion that is in contradistinction to the evidence. Here, the Court of Appeals determined that any rational trier of fact should have concluded that the "driver's license roadblock" was a mere subterfuge for arresting drunk drivers. The State claims that the purpose of a roadblock, like intoxication, identity, and intent, is solely a question of fact to be determined by the trier of fact and is not reviewable by an appellate court. We do not agree.

Whether the determination of a roadblock's purpose by the trier of fact is a question of law or fact, or a combination thereof, is a question of first impression. If it were solely a question of fact, as the State asserts, then we, as well as the Courts of Appeals, would be bound by the findings of the trier of fact, barring any procedural or substantive errors by the trial judge. The crux of the problem, however, is that any discussion of a roadblock's purpose necessarily implicates the Fourth Amendment to the United States Constitution due to the fact that a roadblock constitutes a seizure. See *United States v. Martinez–Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074, 3082, 49 L.Ed.2d 1116 (1976).

■ When a trial court is asked on a motion to suppress to review the legality of a seizure and any subsequent search, it will look to the reasonableness of the officer's activities in light of all the circumstances surrounding the questioned activity. It is the trial court's determination of whether the officer's search was reasonable, constitutional, that a reviewing appellate court will be asked to conduct. "Under the Fourth Amendment the determination of the reasonableness of a seizure is a conclusion of law." *United States v. Bowles*, 625 F.2d 526, 533 (5th Cir.1980) citing *United States v. Mendenhall*, 446 U.S. 544, 551 n. 5, 100 S.Ct. 1870, 1875 n. 5, 64 L.Ed.2d 497 (1980) (Powell, J., concurring in part and concurring in the judgment.) It is axiomatic that conclusions of law are always reviewable by an appellate court.

When we review the reasonableness of a seizure, our analysis focuses on whether there was probable cause or reasonable suspicion for police officers to conduct a particular seizure or search. The standard for determining the existence of probable cause is for this Court to review the totality of the circumstances where there is a Fourth Amendment challenge. See *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 rehearing denied, 463 U.S. 1237, 104 S.Ct. 33, 77 L.Ed.2d 1453 (1983). Therefore, "the duty of the reviewing court is to look to the 'totality of the circumstances' to determine if there exists a substantial basis for concluding that probable cause existed at the time of the questioned action." *Angulo v. State*, 727 S.W.2d 276, 278 (Tex.Cr.App.1987). See also *Eisenhauer v. State*, 754 S.W.2d 159, 164 (Tex.Cr.App.1988). Likewise, the reviewing court will look to the totality of the circumstances to determine if a police officer had reasonable suspicion based on articulable

objective facts to believe an individual was involved in criminal activity.[1] See *Dickey v. State*, 716 S.W.2d 499, 503 n. 4 (Tex.Cr. App.1986) and *Hernandez v. State*, 523 S.W.2d 410, 412 (Tex.Cr.App.1975).

The stopping of an individual at a roadblock, whatever its expressed or implied purpose, is a seizure within the meaning of the Fourth Amendment. *Martinez–Fuerte*, 428 U.S. at 556, 96 S.Ct. at 3082. The State asserts that a determination of the purpose of a roadblock, however, is one of pure fact. In support of its contention, the State cites a litany of other instances [2] where the determination of specific issues is a question of fact that is solely within the domain of the trier of fact. The problem with this series of fact questions is they relate to determinations of the mental state or physical impairments of an individual. Here, we are dealing with the law of search and seizure. The former lends itself towards the assessment of a witness' perceptions of another individual, a province more appropriately suited to the trier of fact. The latter, in contradistinction, entails a review of the facts, but then, those facts are applied to the law of search and seizure to determine if probable cause or reasonable suspicion existed at the time of the questioned activity, which as noted is a question of law. This mixture of law and

fact is inescapable. Therefore, we hold that the determination of a roadblock's purpose is a mixed question of law and fact to be ascertained from looking to the totality of the circumstances and a weighing of all the evidence. This determination is expressly within the bounds of the reviewing court. The State's first ground for review is overruled.

**II**

The State, in its second ground for review, asserts that the Court of Appeals erred in holding sobriety checkpoints, driving while intoxicated roadblocks, are unconstitutional and therefore violative of. the Fourth Amendment to the United States Constitution.[3] The State, as have all other states that have found DWI roadblocks constitutional, relies on *dictum*[4] in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) to the effect that although random stops of motorists are unconstitutional, "[q]uestioning of all oncoming traffic at roadblock-type stops is one possible alternative." *Id.* at 663, 99 S.Ct. at 1401. This one seemingly innocuous sentence in *Prouse*, in context almost a throw away phrase, has become the plinth of the State's argument that all DWI roadblocks are constitutional under the Fourth Amendment.[5] We do not agree.

1. Although we recognize that "[r]easonable suspicion is a lesser quantum of proof than probable cause," *Daniels v. State*, 718 S.W.2d 702, 704 (Tex.Cr.App.1986), we do not see any logical inconsistencies with applying the totality of the circumstances standard to both the probable cause and reasonable suspicion determinations.

2. The State cites cases concerning intoxication, identity, insanity, intent, mental state, duress, entrapment, and questionable conduct by police officers.

3. The concurring opinion by Judge Davis states that the majority "ignores the caveat" (at p. 240) implicit in the Court of Appeals majority opinion and then quotes at length the Dallas Court of Appeals reasoning as to why they believed this particular roadblock was unconstitutional. We did not, however, fail to see the caveat as the concurring opinion asserts; we merely did not feel compelled to follow a Court of Appeals opinion that was so strikingly similar to *Webb v. State*, 739 S.W.2d 802 (Tex.Cr.App. 1987), a (two judge) plurality opinion (authored

by the writer of the concurring opinion) from this Court.

4. The concurring opinion asserts that "based upon the Supreme Court's repeated reference to that language [the *dictum* in *Prouse* ] ... the *traffic safety roadblock* has continued viability...." (at p. 241) (emphasis added). The fallacy of this argument is that the *dictum* has only been elevated to precedential proportions in a limited number of cases, and in no circumstance has the Supreme Court ever used the words nor condoned the creation of "traffic safety roadblocks." Although the Supreme Court suggested the viability of roadblocks for the enforcement of administrative regulations concerning a driver's license and vehicle registration road block in *Prouse*, it has never expanded upon this to include suspicionless stops at roadblocks to enforce *state driving while intoxicated laws* or other similar penal statutes.

5. The concurring opinion subscribes to the theory (at p. 241) that this *dictum* has become the law because it has "been reenforced by later

The seizure of presumably innocent citizens is an affront to a series of rights that an individual possesses because he is a citizen of this State and the United States. These rights are the right to be let alone, the right to privacy, and the right to travel.

Justice Brandeis, articulating the right to be let alone, wrote that:

> The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the rights most valued by civilized men.

*Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J. dissenting). More recently, the United States Supreme Court has reiterated this proposition when it commented, "The guarantees of the Fourth Amendment stand 'as a protection of ... values reflecting the concern of our society for the right of each individual to be let alone.' [citation omitted]" *Schneckloth v. Bustamonte*, 412 U.S. 218, 242, 93 S.Ct. 2041, 2055–56, 36 L.Ed.2d 854 (1973). It is not an immutable right that an individual is to be let alone at all times, but rather, it expresses a general proposition that each individual in a civilized society has the right to expect that the government will not interfere with his existence unless they have a compelling need to protect either him or other persons from some pervasive harm.

Correlative to the right to be let alone is the right to privacy. Justice Douglas observed:

> [S]pecific guarantees in the Bill of Rights have penumbras, formed from emanations from those guarantees that help give them life and substance. [citations omitted] Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment.... The Third Amendment in its prohibition against the quartering of soldiers ['in any house'] ... without the consent of the owner.... The Fourth Amendment explicitly affirms the 'right of the people [to be free] against unreasonable searches and seizures.' The Fifth Amendment in its Self–Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.'

*Griswold v. State of Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). The right to privacy, premised on numerous amendments to the Bill of Rights, joined with the right to be let alone recognizes the importance we as a nation of free people have attached to the right to be permitted to go about our business unfettered by the ever watchful government.

In conjunction with these two analogous rights, we must add the right that is specifically curtailed by the DWI roadblocks—the right to travel. As Justice Brennan noted in *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969):

> This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement.

*Id.* at 629, 89 S.Ct. at 1329.

All three of these rights are materially intruded upon by the State when it insists on stopping motorists at a roadblock with-

---

interpretation of the *same issues* by the Court." (emphasis added). Not so. The constitutionality of sobriety checkpoints has never been addressed by the Supreme Court. Therefore, the

cases cited in the concurring opinion, and those of this opinion, can only be utilized for the purposes of analogy and extrapolation of *similar* issues.

out some legitimate basis predicated on probable cause or reasonable suspicion. It is the expectation of each individual in a free society that when they enter their vehicles to travel from one point to another that they will not be subjected to a detention and questioning without some manifestation of wrongdoing on their part.

The law of the land as embodied in the Fourth Amendment is explicit in its requirement that a search or seizure must be predicated upon probable cause. This truism, however, has been interpreted by the United States Supreme Court to permit police action against an individual premised on evidence that is less than probable cause. See *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Now, when a police officer observes suspicious conduct "which leads him reasonably to conclude in light of his experience that criminal activity may be afoot," *Id.* at 30, 88 S.Ct. at 1884, and that the suspect may be armed he may stop and frisk the suspect for weapons. However, "in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. The effect, then, of *Terry* is that officers are permitted to conduct brief stops for investigatory purposes with a lesser quantum of proof than required for an arrest where the officer can later demonstrate specific articulable facts existed and not just an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* at 27, 88 S.Ct. at 1883.

A DWI roadblock is in direct conflict with *Terry's* fundamental requirement of specificity—individualized suspicion consisting of articulable and objective facts that criminal activity is afoot. At a roadblock, motorists are subject to detention and investigation without any particularized reasonable suspicion. The effect is that the officers are permitted to conduct a wholesale investigation of individuals on the presumption that in all the motorists detained at the DWI roadblock there is at least one who has committed, at a minimum, the offense of driving while intoxi-

cated. *Terry* and its progeny, however, do not permit "hunches" to be the basis for stopping everyone at a particular point so as to subject each individual citizen to an open ended investigation.

This unfounded stop further impinges on the three fundamental rights previously discussed. The roadblock, in the first instance, impedes our right to travel to our destination uninterrupted and without fear of governmental intrusion. Second, it invades our right to privacy. When we enter our vehicle there is an expectation that if there is no evidence of criminal activity discernible by observation we will not be subjected to detention and interrogation by representatives of the State. Finally, in a civilized democratic society we demand that as long as our conduct is not injuring others we will be let alone by the representatives of the State. As citizens of the State of Texas and the United States we have the expectation and the right to be let alone.

### III

Traditionally, the Supreme Court's Fourth Amendment jurisprudence required an analysis that viewed a search or seizure as presumptively unreasonable, and therefore unconstitutional, if it was not premised upon a warrant or probable cause. It followed that neither requirement could be excluded unless there was an exception. The most notable exception was the *Terry* reasonable suspicion test that permits an officer to conduct a frisk of a person he has legitimately stopped and believes is in possession of a weapon. More recently, the Court has reiterated the Fourth Amendment reasonableness or balancing test that it has developed over two decades. As then Justice, now Chief Justice, Rehnquist noted:

Our focus in this area of Fourth Amendment law has been on the question of 'reasonableness' of the type of governmental intrusion involved. Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental in-

terests.' *Delaware v. Prouse, supra,* [440 U.S.], at 654 [99 S.Ct. at 1396]. *United States v. Villamonte–Marquez,* 462 U.S. 579, 588, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22 (1983). This balancing test consists of viewing the facts in each particular case and pronouncing whether the questioned search or seizure was "reasonable." The evolution of the traditional Fourth Amendment analysis to the current Fourth Amendment inquiry has resulted in an area of search and seizure law that permits searches and seizures that lack even an indicia of suspicion. These types of searches and seizures have been more aptly delineated as permissible "suspicionless searches and seizures."

DWI roadblocks constitute a suspicionless search and seizure. The question is whether this type of roadblock is in conformity with current federal law. The answer is a resounding "No" when viewed in light of other types of permissible suspicionless searches and seizures.

The Supreme Court has addressed six[6] areas, exceptions if you will, of permissible suspicionless searches and seizures not covered by the dual requirements of the Fourth Amendment. The first area of suspicionless searches and seizures is most often characterized as administrative inspections. These inspections entail administrative agents conducting a routine building inspection, pursuant to an "area" search warrant, to enforce health and safety codes without any individualized suspicion of illegality on the part of the residents or owners. See *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) and *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18

L.Ed.2d 943 (1967). In *Camara,* appellant sought a writ of prohibition to stop his prosecution for violating the San Francisco Housing Code by refusing to allow a warrantless inspection of his residence in an apartment building. See *Camara,* 387 U.S. at 525, 87 S.Ct. at 1728. The Supreme Court, recognizing this as an exception to the probable cause requirement of the Fourth Amendment, validated these suspicionless searches by determining that in the balance the governmental interest of protecting the public safety in housing outweighed the minimal intrusion on the privacy interests of the individual. See *id.* at 534–535, 87 S.Ct. at 1733–34. This validation focused on three grounds: (1) "such programs have a long history of judicial and public acceptance," (2) experts in the field unanimously agree this method is the only effective means to enforce health and safety codes since violations are not observable from the outside of a building, and (3) the "inspections are neither personal in nature nor aimed at the discovery of evidence of crime, they involve a relatively limited invasion of the urban citizen's privacy." *Id.* at 537, 87 S.Ct. at 1735.

The second area of suspicionless searches and seizures concerns permanent border patrol checkpoints to stem the flow of undocumented workers moving across the southern border of the United States. See *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). In *Martinez–Fuerte,* the appellant was stopped at a permanent border roadblock that is 66 miles north of the United States and Mexican border in California. The border patrol officers discovered after a brief series of questions that appellant's

---

**6.** Although there are six areas of permissible suspicionless searches and seizures approved by the United States Supreme Court, we will only address three of those six areas. In addition to the three areas discussed, the Court has seen fit to permit customs officials the right to board vessels that are capable of making open sea to inspect their documents. See *United States v. Villamonte–Marquez* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). Also, the Court has found INS agents have the right to make immigration "sweeps" at the work place, without probable cause or reasonable suspicion, to find undocumented workers. See *INS v. Delgado,*

466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). More recently, the Supreme Court has held that railroad personnel and Customs Service agents may be subject to blood or urinalysis tests without even reasonable suspicion because the privacy interests of the employees is minimal compared to the governmental interest of public safety on the railways and drug interdiction at the U.S. borders. See *Skinner v. Railway Labor Executives' Association,* — U.S. —, 109 S.Ct. 1402, 103 L.Ed.2d 639 and *National Treasury Employees Union v. William Von Raab,* — U.S. —, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).

two female passengers were in this country illegally. See *id.,* 428 U.S. at 547, 96 S.Ct. at 3078. The Court held that although individualized suspicion is normally required for a constitutional search or seizure "the Fourth Amendment imposes no irreducible requirement of such suspicion." *Id.* at 561, 96 S.Ct. at 3084. The Court analogized this type of limited temporary detention for investigative purposes to that outlined in *Camara.* They accomplished this by suggesting that *Camara,* as in all suspicionless searches and seizures, requires a balancing of the individual's rights with the governmental intrusiveness sought to be protected. See *id.* To determine if the governmental interest outweighs the individual right, the reviewing court must look to the three factors the Supreme Court utilized in *Camara.* First, there should be evidence of a substantial period of judicial and public acceptance of the questioned governmental activity. Second, there is no other means of effective law enforcement. Third, the purpose of the search is not aimed at the discovery of crime. If these factors all are met then the "invasion of the urban citizen's privacy" is minimal, i.e. acceptable. In *Martinez–Fuerte,* the Supreme Court found that the reasonableness of the procedures, stopping all persons at a permanent roadblock and briefly questioning them to ascertain their citizenship, constituted a minimal intrusion upon the motorist's interests. Further, the Court found the record demonstrated the need for this type of specific law enforcement technique[7] and that there was a governmental necessity to control our borders.

The Court felt the "subjective intrusion" of the motorist was less if you stopped all persons at a roadblock rather than using roving patrols. See *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The logic, here, is that "[b]ecause motorists, apparently like sheep, are much less likely to be 'frightened' or 'annoyed' when stopped en masse, a high-

way patrolman needs neither probable cause nor articulable suspicion to stop *all* motorists ... but he cannot without articulable suspicion stop *less* than all motorists." *Prouse,* 440 U.S. at 664, 99 S.Ct. at 1401–02. (Rehnquist, J. now C.J. dissenting). In addition, this permanent roadblock stop is the best law enforcement technique because there are no outwardly observable signs of illegality when viewing a vehicle to determine if it contains undocumented workers.

The important thing to note about this second area of permissible suspicionless searches, and about *Martinez–Fuerte,* is the tremendous restraint the Supreme Court used in authorizing PERMANENT, FIXED roadblocks. As stated in *Martinez–Fuerte:*

> Routine [fixed/permanent] checkpoint stops do not intrude similarly [to roving-patrol stops] on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated, is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest.
>
> \*   \*   \*   \*   \*   \*
>
> In summary, we hold that stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant.... *Our holding today is limited to the type of stops described in this opinion.* (emphasis supplied)

428 U.S. at 559, 566–567, 96 S.Ct. at 3086–87.[8]

---

7. The record demonstrated that in 1973 approximately 17,000 undocumented workers were apprehended at the roadblock in question. See *Martinez–Fuerte,* 428 U.S. at 554, 96 S.Ct. at 3081.

8. Regrettably the concurring opinion misses the tenor of *Martinez–Fuerte* when it states, "The safeguards outlined above are as relevant to temporary checkpoint as to a fixed checkpoint" (concurring opinion page 243). When the Court

The third area of permissible suspicionless searches and seizures is roadblocks for the purpose of checking driver's licenses and vehicle registration. In *Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Supreme Court held that the practice, by the police in Delaware, of randomly stopping vehicles, lacking any individualized suspicion, violated the Fourth Amendment. Although *Prouse* is cited as the case permitting roadblocks, it is only, as the concurring opinion concedes (page 246), in dictum that the Court suggested the "[q]uestioning of all oncoming traffic at roadblock-type stops is one possible alternative" to unconstitutional random stops. Significantly the Court in its concluding paragraphs, and not in dictum, reiterated its long standing position concerning Fourth Amendment rights as it applies to persons in vehicles on public highways when it wrote:

> "*An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation.* Automobile travel is a basic, pervasive and often necessary mode of transportation to and from one's home, workplace and leisure activities. Many people

spend more hours each day traveling in cars than walking in streets.... Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As *Terry v. Ohio*, supra, recognized, *people are not shorn of all Fourth Amendment protection when they step from their homes onto public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles.*" (emphasis supplied)

*Id.* at 662, 99 S.Ct. at 1400–01.

The impetus for validation of *temporary* roadblocks occurred in two subsequent cases. The Supreme Court stated "we agree" and cited to the *Prouse* dictum when this Court, the Court of Criminal Appeals, approved a stop at a routine driver's license roadblock to ascertain if the driver was in compliance with our driver's license statute. See *Texas v. Brown*, 460 U.S. 730, 736, 739, 103 S.Ct. 1535, 1540, 1541, 75 L.Ed.2d 502 (1983). See also *United States v. Villamonte–Marquez*, 462 U.S. 579, 588, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22 (1983) (here the Supreme Court cited to the same dictum as though it were the holding in *Prouse* ).[9]

states, "motorists who use these highways are not taken by surprise," "The regularized manner in which established checkpoints are operated," and "Our holding today is limited to the type of stops described in this opinion" it intended to limit its permission and its rationale to ONLY fixed permanent checkpoints. The concurring opinion makes a giant leap from fixed, permanent routine checkpoints to random, temporary checkpoints without any appreciation of the obvious distinctions between the two.

**9.** The facts in this case concerned U.S. Customs officers boarding a vessel in a ship channel to check the ship's documentation. Officers detected the odor of marihuana when they boarded the ship and upon looking through an open hatch they discovered bales of the contraband. Although the concurring opinion implies this is some type of roadblock case (at p. 242), this case is wholly inapposite from sobriety checkpoint cases. The Court in authorizing this type of suspicionless search did so based on a one hundred and ninety-three year old federal statute and the unique fact of the ship's immediate accessibility to the open sea. They clearly recognized the dissimilarities between state vehicle

registration law checkpoints and the boarding of oceangoing vessels. *See id.*, 462 U.S. at 586–587 and 592–593, 103 S.Ct. at 2578–79 and 2581–82.

It is most unfortunate that the concurring opinion recapitulates the continuing elevation of *dictum* to precedence when it quotes the Supreme Court's discussion in *Villamonte–Marquez* of the *Prouse dictum* that improperly paraphrases the majority opinion of *Prouse* as permitting roadblocks for safety purposes. Any implication that *Villamonte–Marquez* stands for the proposition that a driving while intoxicated roadblock is constitutional connotes an entirely false impression. The Supreme Court, in *Villamonte–Marquez*, distinguished that case from stops on roadways when it said "It seems clear that if the customs officers in this case had stopped an automobile on a public highway near the border, rather than a vessel in a ship channel, the stop would have run afoul of the Fourth Amendment because of the absence of articulable suspicion." Id., at 588, 103 S.Ct. at 2579. The court went on to say that it was because of the important *factual* differences between vessels in waters having ready access to the open sea and automobiles on principle thoroughfares in the border area, the "overarching

License and registration checkpoints appear to meet all the criteria outlined in *Camara*, 387 U.S. at 537, 87 S.Ct. at 1735. The Court has noted that suspicionless stops to check drivers' licenses are widely used by state law enforcement agencies. See *Martinez–Fuerte*, 428 U.S. at 561 n. 14, 96 S.Ct. at 3084 n. 14. Like administrative searches, a roadblock for license check purposes is the only viable law enforcement tool because, as with health and safety code violations, there are no outwardly visible manifestations that the driver is in violation of a driver's license or registration statute by observing a moving vehicle. Further, the investigation at this specific purpose roadblock is not intended at detecting evidence of a crime but rather the enforcement of administrative regulations.

## IV

The Supreme Court has traditionally required that at the very least there be reasonable suspicion that criminal activity is afoot and that the articulable objective facts point to a particular individual. As Fourth Amendment law evolved, the Supreme Court went from focusing on the totality of articulable facts giving rise to an officer's particularized suspicion to balancing the needs of society with the intrusion upon individual interests. The Court stated that:

> Consideration of the constitutionality of such seizures involves a weighing of the gravity of public concerns served by the

seizure, the degree to which the seizure advances the public interest, and the severity of the individual liberty.

*Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979). This balancing test is the basis for analyzing searches and seizures that have failed to meet a minimal standard of reasonable suspicion. The balancing test requires the reviewing court to analyze Fourth Amendment challenges similar to the cost benefit analysis a business performs to determine the financial suitability of a particular business activity, i.e. level of individual intrusion versus societal benefits. The Court has seen fit to compartmentalize this erosion of the Fourth Amendment by delineating an entire area of Fourth Amendment law devoid of any Fourth Amendment analysis by its creation of the aforementioned area of suspicionless searches and seizures.

DWI roadblocks do not qualify as exceptions to the probable cause or reasonable suspicion requirements of the Fourth Amendment by just characterizing them as suspicionless searches and seizures. To qualify as a "reasonable" suspicionless search or seizure the police activity must meet the traditional balancing test, but the societal benefits must comport with the three balancing factors [10] explicated in *Camara* and thereby outweigh the intrusion on the individual's interests. As will be seen, these types of roadblocks fail to meet *any* of the three tier analysis of *Camara*.[11]

principle of 'reasonableness' embodied in the Fourth Amendment" required a different result.

**10.** Especially factor two, that there was *NO other means* of effective law enforcement, which was the *determining* factor in *Villamonte–Marquez* and *Martinez–Fuerte*, as well as *Camara*.

**11.** Likewise, constitutionality is not imbued by merely creating "neutral guidelines," as the concurring opinion suggests, for the administration of roadblocks. The concurring opinion relies heavily on the analysis that its author utilized in the plurality (two judge) opinion in *Webb v. State*, 739 S.W.2d 802 (Tex.Cr.App.1987). See pp. 242–245. The problem, however, is that this misconstrues the Supreme Court's Fourth Amendment analysis in this area. *Webb* relied on the three part test set out in *Brown* (delineated in today's opinion in the paragraph preceding this footnote insertion) which stated that

determining the constitutionality of a seizure that is less intrusive than a traditional arrest involves a weighing of "the gravity of the public concern served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown*, 443 U.S. at 50, 51, 99 S.Ct. at 2640. True, in *Brown*, the Supreme Court required that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Id.* 443 U.S. at 51, 99 S.Ct. at 2640 (emphasis supplied). This "plan", however, only serves to placate the central concern in balancing the three competing considerations of 1) public concern, 2) degree of advancement and 3) severity of interference. This central concern is that privacy will not be arbitrarily invaded by officers. *Id.* at 51, 99 S.Ct. at 2640. It is only "to this end" of curbing arbitrariness

As to the first ground used in the balancing test between society's interests and intrusion on the individual, a "long history of judicial and public acceptance", there is no evidence that DWI roadblocks have such a history of judicial and public acceptance. To the contrary, there is still an ever increasing debate as to their constitutionality; and they have been sparingly utilized and only have come into use in the last decade.[12]

The second ground from *Camara,* that this is the only effective means of accomplishing the societal purpose, merits added weight since originally pronounced in 1967 because, as stated previously, more recent cases from the Supreme Court have all used this ground (no other means of effective law enforcement) as the determinative factor that will, in itself, cause a seizure to run afoul of the Fourth Amendment. See *Villamonte–Marquez* and *Martinez–Fuerte, Delaware v. Prouse,* etc. DWI roadblocks are not the only means of enforcing the strong public interest in eradicating the intoxicated motorists. There are clearly alternatives to curbing the carnage of the intoxicated driver that are in fact working. These alternatives include use of special DWI tasks forces, such as the officers in this case were assigned to, in a fashion where extra police are sent out to *patrol* roads suspected of being, at particular times, more subject to travel by intoxicated drivers. Law enforcement personnel are trained to watch for intoxicated drivers by looking for outwardly visible articulable facts, e.g. driving at inconsistent speeds, unable to stay in one's lane, disregarding traffic signals and signs, and driving at night without lights.[13] Increased public awareness to the problem of alcohol related accidents and deaths and a corresponding change in the public's heretofore somewhat permissive attitude toward intoxicated drivers has, just in the last decade, been brought about by public service advertising in the media and in drinking establishments themselves, as well as by grass roots efforts by groups like Mothers Against Drunk Drivers (MADD) as well as other crime victim groups. Criminal penalties for driving while intoxicated in Texas have been steadily increased over this time period, and have been made more sophisticated in their application. Moreover, there is no evidence that DWI roadblocks will be effective in curbing incidents of DWI.

Third and finally, the inspections at a DWI roadblock are aimed at detecting criminal activity.[14] Criminal sanctions may

---

that the fact a seizure was carried out pursuant to a plan has any relevance.

**12.** The states are divided as to what grounds to hold DWI roadblocks unconstitutional. This division falls into three categories: (1) unconstitutional under the Fourth Amendment to the United States Constitution, (2) unconstitutional under a particular provision of a state's constitution, or (3) unconstitutional as procedurally applied under either state or federal guidelines. 37 ALR4th 1.

**13.** The Arizona Supreme Court in holding that DWI roadblocks in Arizona were unconstitutional under the Fourth Amendment stated that its decision turned upon the State's stipulation as noted in the opinion:

In the past, the foremost method of enforcing the DWI laws has been by observing how the person drives. The state has stipulated that 'DPS officials, by observing and patrolling, regularly arrest drivers for DWI when there are no roadblocks. DPS officers are trained to detect drunk drivers on the road on the basis of observation. An experienced DPS officer becomes highly skilled at detecting drunk drivers by watching how a person drives. Without roadblocks, an experienced DPS officer can detect many drunk drivers.' *State ex rel. Ekstrom v. Justice Court,* 136 Ariz. 1, 663 P.2d 992, 996 (1983). Subsequently, the Arizona Court has reversed its position, on other grounds, as to the constitutionality of DWI roadblocks. *State v. Superior Court of the County of Pima,* 143 Ariz. 45, 691 P.2d 1073 (1984).

**14.** The concurring opinion argues that deterrence, and not the detection of criminal activity, is the "primary goal" of sobriety checkpoints. See p. 246. The author draws heavily from *Ingersoll v. Palmer,* 43 Cal.3d 1321, 241 Cal.Rptr. 42, 743 P.2d 1299 (1987). *Ingersoll* would seem to be poor authority in view of the fact that it reflects the lack of unanimity, contrary to the concurring opinion's assertions, even among members of the same court. Two justices joined the lead opinion, three concurred in the result without opinion and three justices dissented. Justice Broussard's dissenting opinion points out numerous inconsistencies in the *Ingersoll* opinion that are mirrored in Judge Davis' analysis:

The majority concedes that if the primary purpose of the roadblock were to detect

be imposed for violations of the Texas DWI Statute. It is a misdemeanor on the first two convictions and any subsequent convictions may result in felony penalties.

It is beyond dispute that tragedy strikes the families, friends, and victims of persons driving while intoxicated. What is in dispute is just how to prevent this tragic phenomenon on our nation's highways. It is our duty to administer justice in accordance with the laws of this State. This is not the end, but only the beginning of our responsibilities as a court. We also must zealously scrutinize the ever increasing onslaught by the government to curtail our individual freedoms in the name of public safety and compelling state interest. These words are not to be invoked as a mere talisman by the State every time it wishes to discover potential criminal activity by circumventing the dictates of the Fourth Amendment.

We live in a nation where each individual is presumed to be innocent of criminal activity. For the State to assume criminal conduct has occurred thereby permitting it to take preemptive actions results in scenarios of the Orwellian state. As the members of the Court of Criminal Appeals in Oklahoma have found:

> crime, the detention of a driver without individualized suspicion that the driver had engaged in criminal activity would be unconstitutional. In fact, the roadblock has two purposes: detection of drunk drivers and collection of evidence. The majority maintain, however, that the primary purpose of these roadblocks is to promote public safety by deterring drunk driving. The majority assert that this is a regulatory or administrative purpose, and conclude that detention without individualized suspicion is permissible by analogy to the administrative search doctrine....
>
> \* \* \* \* \* \*
>
> A drunk driving roadblock ... differs from the usual administrative or regulatory inspection because there is no 'regulatory' agency to enforce the drunk driving prohibition other than the police and the criminal courts. [footnote omitted] The clear purpose of these laws is not to regulate, but to detect and punish criminal drunk driving. Nothing distinguishes this crime from any other serious one.
>
> \* \* \* \* \* \*
>
> *If we allowed detentions without individualized suspicion to deter crime, we would allow preventative detentions in high crime areas.*

The Court finds such activities by law enforcement authorities, while commendable in their ultimate goal of removing DUI offenders from the public highways, draw dangerously close to what may be referred to as a police state. Here, the state agencies have ignored the presumption of innocence, assuming that criminal conduct must be occurring on the roads and highways, and have taken an 'end justifies the means approach. The Court is not so naive to think that criminal conduct does not occur regularly.... Yet, a basic tenet of American jurisprudence is that the government cannot assume criminal conduct in effectuating a stop such as the one [DWI roadblock] presented herein.

*Oklahoma v. Smith,* 674 P.2d 562, 564 (Okl.Cr.App.1984).

### V

■ We now turn to the specifics of appellant's case. As previously noted, the determination of a roadblock's particular purpose in appellant's cause of action, as in all search and seizure cases, is to be settled by the reviewing appellate court because it is a mixed question of law and fact. The

> But we do not allow such practices. (citations omitted) ... *What distinguishes the permissible administrative inspection from other searches is not that they are only intended to deter, but that they carry out an administrative scheme that is not part of the penal system. There is no such administrative scheme here.*
>
> \* \* \* \* \* \*
>
> A request to look at one's license is far less accusatory than an inspection for red, watery eyes, slurred speech, alcohol on the breath, open containers in the car, and the other signs of intoxication. It does not follow that, because a roadblock may be permissible to check for driver's licenses, it must be permissible to check for drunk driving.
>
> To call a drunk driving roadblock an administrative inspection ignores its true purpose—apprehension of drunk drivers. The fact is that the apparatus of the law enforcement system is moved to the scene of the roadblock—with breathalyzers ready to take evidence for introduction at a criminal trial, police officers ready to arrest offenders, and police vans ready to take suspects away. (emphasis supplied)
>
> *Id.,* 241 Cal.Rptr. 42, 743 P.2d at 1319–1320.

assessment of the intent of authorities in erecting a roadblock is done by viewing all of the facts in the totality of the circumstances. To recapitulate, the roadblock was established within less than a mile of bars located on Beltline Road, it was erected to stop those motorists going in only one direction (everyone leaving the bars could only travel in that direction), it was conducted shortly before the bars closed at 2:00 a.m., and "most" of the officers at the roadblock were members of the DWI Task Force. These facts conduce to show that for all intents and purposes this particular roadblock was for the specific purpose of apprehending motorists who were driving while intoxicated and was not, as Officer Carter testified, a driver's license check point.

We therefore hold that the Fourth Amendment requires the assessment of, at a minimum, reasonable suspicion to stop and detain individuals for investigatory purposes.[15] There is, however, a limited area of exceptions that permits suspicionless searches and seizures for what would best be described as the enforcement of administrative or regulatory statutes where there is no visible manifestation of individual violations. DWI roadblocks are not part of such an excepted area. Rather, they are designed to be merely preemptive in nature, and are premised on nothing more than inarticulable facts—hunches that criminal conduct exists on our roads, and as such are suspect as an infringement upon our individual freedoms of privacy

and travel.[16] Accordingly, we affirm the Court of Appeals' holding that this particular roadblock was violative of appellant's Fourth Amendment rights.

W.C. DAVIS, Judge, concurring and dissenting.

There are two inherent problems with the majority opinion handed down this day. First, although affirming the holding below that "this particular roadblock" ran afoul of appellant's Fourth Amendment rights, the majority ignores the caveat accompanying the holding, to wit:

> We hold that appellant had a reasonable expectation of privacy at the time and place of the stop. If the police had had extrinsic evidence that appellant was driving while intoxicated, such as his driving in an unsafe manner, then they would have had probable cause to stop him. *Moreover, if the State had acknowledged the true purpose of the roadblock and had presented evidence that the timing and location of this roadblock were not arbitrary, but had been carefully selected because of an unusually high proportion of drunken drivers observed at the location at similar hours on previous occasions, and that such a roadblock was more effective than other means to protect the public, then a different question would be raised concerning the reasonableness of this limited intrusion on the privacy of the drivers within the principle of Terry v. Ohio, 392 U.S. 1, 88 S.Ct.*

**15.** The concurring opinion asserts that where there exists a neutral set of guidelines for the creation of a sobriety checkpoint and the "State is honest as to its intentions", the Fourth Amendment has been complied with. Justice Broussard best demonstrates this fallacy when he writes:

> The majority seem to suggest that as long as a neutral plan assures that the roadblock is run safely and without arbitrariness, the individual's interest in being free from police detention does not weigh in the balance at all. This antiseptic approach denies the unavoidable invasion of privacy which occurs when a citizen is confronted by the police and his demeanor inspected for evidence that he is committing a crime. Furthermore, the protection of the neutral plan is illusory.... As there is apparently no remedy for violations

of the neutral plan, the plan is no protection against arbitrariness.
*Ingersoll,* 743 P.2d at 1322.

**16.** We have held, today, that this DWI roadblock was unconstitutional under the Fourth Amendment to the United States Constitution. Although it is neither timely nor popular to rule against the politically charged issue of removing drunk drivers from our highways, it is imperative that we never forget as citizens of a free land we must on occasion pay the price for our continued freedom from tyranny. This price we pay for our freedom is often high but we cannot succumb to these quick fix alternatives of law enforcement when the result is to unduly repress the general freedoms we are afforded under the United States Constitution.

*1868, 20 L.Ed.2d 889 (1968)....* (Emphasis added)

*Higbie v. State,* 723 S.W.2d 802 (Tex.App. —Dallas 1987). Because no such evidence was presented by the State regarding these matters, the Court of Appeals correctly held the warrantless seizure to be violative of appellant's constitutional rights.

The second problem with the majority opinion is interrelated with the first. While the appeals court suggests that under certain circumstances such a roadblock might be reasonable, the majority paints with a much broader brush in finding DWI checkpoints *per se* unconstitutional. In so doing, the majority ignores express language to the contrary by the Supreme Court of the United States, dismissing that Court's Fourth Amendment analysis and reasoning regarding roadblock-type stops as mere "dictum." As will be shown, *infra,* said dictum has been reinforced by later interpretation of the same issues by the Court.

It is axiomatic that the stopping of an automobile and detention of its occupants constitutes a "seizure" within the meaning of the Fourth and Fourteenth Amendments to the federal constitution, regardless of the limited purpose for the stop or length of actual detention. *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). The Fourth Amendment, however, does not prohibit all seizures; only those deemed "unreasonable" will fail to pass constitutional muster. As the Supreme Court made clear in both *Prouse* and *Martinez–Fuerte,* both supra, a seizure is not *per se* unconstitutional under the Fourth Amendment simply because the stop is not based on either probable cause or reasonable suspicion. Rather, seizures may also be determined "reasonable" if there are limitations placed on the "unbridled discretion" of the field officers. *Id. See also Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). The *Prouse* Court stated:

> The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcemnt agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions ...' Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'

*Id.,* 440 U.S. at 655, 99 S.Ct. at 1397, citing *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

Since the decision in *Prouse,* supra, the Supreme Court has returned to the issue of checkpoints. In *Brown v. Texas,* supra, the Court noted that as an alternative to a stop based upon individualized suspicion, a seizure may also "be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown v. Texas,* 443 U.S. at 51, 99 S.Ct. at 2640. Then in *United States v. Villa-monte–Marquez,* 462 U.S. 579, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), the Court had the following to say regarding the roadblock stop:

> Alternative methods, such as spot checks that involve less intrusion, or questioning of all oncoming traffic at roadblock-type stops, would just as readily accomplish the State's objectives in furthering compliance with auto registration and safety laws.
>
> \*    \*    \*    \*    \*    \*
>
> ... Random stops without any articulable suspicion of vehicles away from the border are not permissible under the

Fourth Amendment [citations omitted] but stops at *fixed checkpoints or at roadblocks are.* (Emphasis supplied). *Id.* 103 S.Ct. at 2582.

Contrary to the finding by the majority today that the "dictum" in *Prouse,* supra, has no importance to the issue at bar, a more logical conclusion based upon the Supreme Court's repeated reference to that language is that the traffic safety roadblock has continued viability under Fourth Amendment analysis.

Utilizing the Supreme Court's analysis regarding such traffic safety roadblocks, a number of state courts have held sobriety checkpoints to be constitutional under the Fourth Amendment. *See generally* cases cited in *State v. Henderson,* 114 Idaho 293, 756 P.2d 1057, 1062 n. 3 (Idaho 1988). States that have decided to the contrary have usually done so either on the basis of state constitutions or legislative prohibitions. *Id.* Others have done so due to the nature of the particular police operation, including this Court in *Webb v. State,* 739 S.W.2d 802 (Tex.Cr.App.1987). *See generally,* cases cited in *State v. Henderson,* supra, 756 P.2d at 1062–1064. *See also* 37 ALR 10–34 (Supp.1988). As one commentator has said:

Some decisions are to be found upholding practices along these lines, while other courts have struck down on constitutional grounds a particular police operation of a sobriety checkpoint. However, the decisions in the latter category focus in the main upon certain precautions the police failed to take or certain excesses the police engaged in, and thus should not be construed as holding that a sobriety checkpoint operation is under all circumstances unconstitutional. Because that is so, and because also the Supreme Court's discussion of immigration checkpoints and driver's license inspection checkpoints appears to lend some support to the practice here under discussion, it seems fair to conclude that a DWI roadblock is constitutional if properly conducted.

4 W. Lafave, Search and Seizure § 10.8(d), at 70 (2d Ed.1987). *See also State v.*

*Henderson,* supra. I would agree with the above assessment. The Supreme Court has in post *Prouse* cases pointed out that roadblocks may be a viable law enforcement tool even though they are not based upon individualized suspicion. It is this very lack of particularized suspicion that then requires a stricter set of safeguards in order for the roadblock to pass constitutional muster.

In *Webb,* supra, we were faced with a similar fact situation to that found in the instant case. Although a plurality opinion, *Webb,* supra, contains a good discussion of the constitutional ramifications of a traffic safety roadblock or checkpoint. I would refer the reader to that opinion for a discussion of various state cases not contained *infra.* There we identified three main factors to be analyzed to determine the reasonableness of a suspicionless stop: (1) the interest or need of the government for the particular practice; (2) the discretion exercised by officers in the field; and (3) the intrusion to the individual affected by this procedure. These factors, it was pointed out, correspond to the three factors listed in *Brown,* supra, namely: (1) gravity of the public concerns served by the seizure; (2) the degree to which the seizure advances the public interest; and (3) the severity of the interference with individual liberty. *Brown v. Texas,* 443 U.S. at 51, 99 S.Ct. at 2640.

As to the first factor, it cannot be doubted that the State has a strong interest in deterring the drunk driver. As we noted in *Webb,* supra, the Supreme Court took notice of the public interest in *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) wherein it was said "(t)he carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court ... has repeatedly lamented the tragedy." The problem is of huge proportion, raising analogies of the carnage of war. *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971) (Blackmun, J., concurring) ("The slaughter on the highways of this Nation exceeds the death toll of all our wars"); *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) ("The in-

creasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield.") For one to doubt the existence of the problem, and the corresponding vital interest in public safety, is to deny the logical nexus between alcohol and accidents. Moreover, there exists a real need for a systematic program of deterrence. Traditional means—stops based upon individualized probable cause or reasonable suspicion—do not constitute a viable alternative alone to fight the alcohol menace on our nation's highways. Professor LaFave writes:

> ... [I]t might be contended that the public interest argument is relatively weak in the DWI context because instances of suspected driving while intoxicated can be detected by officers on routine patrol and thus can be dealt with under the *Terry* reasonable suspicion approach. * * * But ... a rather strong argument can be made that mere patrol and stoppings based upon the *Terry* standard do not produce what the *Camera* [*Camara*] Court referred to as 'acceptable results.' For one thing, even if a patrolling officer is fortunate enough to be in the vicinity where a drunk driver is operating his vehicle, it does not necessarily follow that the driver will at that particular time drive his car in such a fashion as to create a reasonable suspicion justifying a stop. And the chances of such observation in the first place are rather slight, given the substantial number of intoxicated drivers on the roads. * * * It is by no means surprising, therefore, that it has been reliably estimated that only one of every 2,000 drinking drivers is apprehended.

4 LaFave § 10.8(d) at 72–73. *See also State v. Superior Court of the County of Pima,* 143 Ariz. 45, 691 P.2d 1073 (1984) (appellate court noted that traditional methods such as increased patrols had not produced reduction in injuries from alcohol-related accidents); *State v. Coccomo,* 177 N.J.Super. 575, 427 A.2d 131 (1980) (intoxicated motorist arrested at checkpoint had not exhibited any erratic driving prior to stop).

Against the public interest discussed *ante* we must also balance the Fourth Amendment interests which will obviously be threatened or intruded upon by operation of a sobriety or other type of checkpoint. Relevant to this issue are the thoughts of the Supreme Court in *Martinez–Fuerte* stating why the roadblock in that case was not impermissibly intrusive:

> First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocations of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harrassing stops of individuals than there was in the case of roving patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review.

*United States v. Martinez–Fuerte,* 428 U.S. at 559, 96 S.Ct. at 3083–84.

The safeguards outlined above are as relevant to a temporary checkpoint as to a fixed checkpoint. While the *Martinez–Fuerte* court was obviously concerned with permanent checkpoints, the same analysis has been used in the license cases such as *Brown,* supra, where the roadblocks are necessarily of a temporary nature. It is not the permanence of the checkpoint that

is the issue; rather, it is the presence of adequate safeguards surrounding the operation that determines the constitutionality of the roadblock stop. As was stated in *Webb,* supra, the operation must be conducted according to criteria formulated in advance by administrative officials. The procedures used must be uniform and be minimally intrusive to the rights of the motorist. The field officers actually running the checkpoint should be instructed to stop each vehicle, inform the driver of the purpose for the stop, and perhaps hand him literature on the program. For example, in Maryland, comprehensive regulations were formulated and then reviewed and approved by the Superintendent of the state police, the Attorney General, and the Governor. As prescribed in the regulations, locations were selected on the basis of data on alcohol-related accidents supplied by the Highway Administration. Three locations were selected for each operation, with times and places approved in advance by a state police administrator. Safety was a primary consideration in choosing locations as well. Checkpoints had to be well lit, marked well in advance of the actual stop, with adequate surface shoulders and a safe place for motorists to make a U-turn before reaching the checkpoint. Officers were also allowed to temporarily suspend operations to relieve traffic congestion. *See Little v. State,* 300 Md. 485, 479 A.2d 903 (1984).

Regarding the stop itself, the regulations provide the following details:

All traffic approaching the checkpoint will be stopped as long as traffic congestion does not occur. The trooper will approach each motorist and state, 'I am Trooper (John Doe) of the Maryland State Police. You have been stopped at a sobriety checkpoint set up to identify drunk drivers.' If there is no immediate evidence of intoxication, a traffic safety brochure developed specifically for this enforcement strategy will be given to the motorist. The trooper will suggest to the motorist that he read the brochure at a later time for a more complete explana-

tion of the stop. The motorist will then be assisted to safely proceed.

*Id.* 479 A.2d at 906.

The Maryland regulations specifically instruct officers to look for particular, articulable signs of intoxication:

... an 'odor of alcoholic beverage about the driver, slurred speech, the general appearance, and/or behavior normally associated with DWI violators.' If these observations give the officer reason to believe that the driver may be intoxicated, the vehicle may be referred to the shoulder for additional investigation. There, the motorist is asked to produce a driver's license and vehicle registration and may be asked to perform certain coordination tests. If these tests produce sufficient evidence of intoxication, the motorist is arrested.

Of interest is the provision requiring each motorist to choose whether or not he or she will proceed to the checkpoint, and whether to speak with the officer once the stop is made. As the *Little* court stated:

A motorist wishing to avoid a sobriety checkpoint may make a U-turn onto a side road prior to reaching the roadblock. No action is taken against a driver doing so unless the motorist drives erratically. For example, on several occasions, drivers ran off the road while trying to turn around and they were stopped. Likewise, a driver who stops at the checkpoint but refuses to roll down the car window is allowed to proceed. If other signs of intoxication are observed, the driver may be followed to detect signs of erratic driving.

From the above it is clear that a set of neutral guidelines can be developed in order to combat the very real menace of drunk driving. Another good example may be found in Arizona, in two cases cited by the majority as footnote material. The Arizona Supreme Court in *State ex rel. Ekstrom v. Justice Court,* 136 Ariz. 1, 663 P.2d 992 (1983) focused on the *procedures used* in operating the roadblock and found them to be constitutionally deficient. The court went on to make suggestions for a proper stop. A year later in the case of

State v. Superior Court of the County of Pima, supra, the Arizona court, noting that certain omissions had been corrected, held the roadblock to be valid under the Fourth Amendment. The Massachusetts Supreme Court has also held its own sobriety checkpoint a permissible constitutional intrusion in *Commonwealth v. Trumble*, 396 Mass. 81, 483 N.E.2d 1102 (1985), after earlier reversing a conviction due to improper procedures used in the roadblock discussed in *Commonwealth v. McGeoghegan*, 389 Mass. 137, 449 N.E.2d 349 (1983).

It is apparent that Maryland and other states have developed comprehensive, minimally intrusive plans to further the important state interest of deterring motorists besotted with alcohol. At least one state has been asked to invalidate a sobriety checkpoint stop on the same basis as relied upon by the majority today to invalidate all such roadblocks. In *Ingersoll v. Palmer*, 43 Cal.3d 1321, 241 Cal.Rptr. 42, 743 P.2d 1299 (1987), the petitioners contended the validity of a sobriety checkpoint stop must be determined by a standard requiring individualized suspicion of wrongdoing. The California Supreme Court disagreed, because the primary purpose of the stop was not to detect crime or gather evidence, but to promote public safety by deterring intoxicated drivers from driving on the public roads. Therefore, the court concluded "the propriety of the sobriety checkpoint stops involved here is to be determined not by the standard pertinent to traditional criminal investigative stops, but rather by the standard applicable to investigative detentions and inspections conducted as part of a regulatory scheme in furtherance of an administrative purpose." *Id.* at 1304.

To this point in time, it is not clear that this state has undertaken such a task. Although there is some evidence in the record that the instant checkpoint was set up according to a "neutral plan" formulated by administrative personnel, such a plan, without more, does not fulfill Fourth Amendment reasonableness requirements. In *Webb*, supra, it was noted:

The *procedures* may have been neutral, but the entire scheme seen in the whole may nevertheless be violative of the Fourth Amendment's prohibition against unreasonable seizures. *Meeks v. State*, 692 S.W.2d 504 (Tex.Cr.App.1985) is a perfect example. In *Meeks*, a variety of different law enforcement agencies supplied officers to man a roadblock set up on U.S. Highway No. 90 in West Texas between Sanderson and Marathon. At trial, the evidence reflected that the roadblock was set up to 'enforce all the laws,' the different agencies working togeather on 'anything that would be a violation of some type.' 692 S.W.2d at 506.

We went on to find that the "all purpose" roadblock, even though operated pursuant to ostensibly neutral guidelines and for the purpose of checking driver's licenses, was not authorized regardless of the fact that the officer making the stop had initially asked to see Meek's license.

While the "pretext" test utilized in *Meeks v. State*, 692 S.W.2d 504 (Tex.Cr.App.1985) would appear to have been largely displaced by the balancing test in roadblock situations, it should still have application in cases such as the instant one where the record reflects a general investigatory stop devoid of the type of "safeguards" envisioned by the Supreme Court. Where the State contends that the sole purpose for a roadblock was as a statutorily permitted license checkpoint, but the evidence, as here, clearly indicates the operation was intended as investigatory, the pretext standard may still apply. As pointed out by the majority in the first pages of the opinion, the Court of Appeals decided that the roadblock was a subterfuge for arresting drunk drivers. Since it was a subterfuge operation, I would hold the stop invalid under *Meeks*, supra. However, if further analysis of the roadblock issue was necessary under *Prouse*, supra, and its progeny, I would still find the roadblock invalid due to lack of proper operative guidelines and level of intrusion, but would provide guidance as to necessary safeguards as has been done by other state's courts. Under a properly developed program wherein the State is honest as to its intentions, I would hold a sobriety checkpoint to be permissible under the Constitution where there can be

shown a demonstrated need for the program, that regulations have been promulgated and approved by top administrative personnel such as found in the cases cited *infra,* to sharply limit the discretion of the field officers, regulate the operation of the checkpoint, and limit the degree of intrusion to the individual. The intrusiveness factor may be favorably balanced in particular by publicizing the State program, providing advance notice of the upcoming stop by means of signs and lights, observing proper safety precautions to protect drivers and officers, and specifying the actions to be taken and communication which may be made between officer and motorist should the driver choose to procede to the stop. Because this type of stop is without doubt intrusive, it is important to strictly limit the time which each motorist is detained. To this end, I would favor the Maryland approach. A 15 to 20 second period of direct communication, if the driver chooses to do so, would appear to be adequate and would prevent the stop from becoming a general purpose investigatory stop of the type that is clearly prohibited under *Meeks,* supra, as well as Fourth Amendment principles.

In conclusion, I reiterate my concern over the majority's treatment of the Supreme Court's Fourth Amendment analysis of roadblock stops. In underscoring the distinction between roving stops and other alternative types of stops, that Court held that the roving stop made without reasonable suspicion was contrary to the Fourth Amendment. But, the Court was also careful to state that, "[t]his holding does not preclude the State of Delaware or other states from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative." *Prouse,* 440 U.S. at 663, 99 S.Ct. at 1401. Although technically dictum, the language used was not mere rhetoric. Rather, it implicitly acknowledged the constitutionality of a different method of temporary seizure, one where "viability" depends not upon the existence of probable cause but upon the existence of neutral criteria which restrict and restrain the officers' operational discretion. That the Court made specific refernce to this language in later opinions reinforces the point.

The nexus between Fourth Amendment analysis and roadblock-type cases is best explained in the following passage from *Ingersoll,* supra:

> This (*Prouse*) dictum was not mere rhetoric, however. It is analytically consistent with the court's holdings in other cases. Standardless and unconstrained discretion on the part of the government officers is what the court sought to circumscribe in the regulatory inspection and stop cases. (*Almeida–Sanchez v. United States* (1973) 413 U.S. 266, 270, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596; *Camara v. Municipal Court,* supra, 387 U.S. 523, 532–533, 87 S.Ct. 1727, 1732–1733.) Accordingly, such stops and inspections for regulatory purposes may be permitted if undertaken pursuant to predetermined specified neutral criteria (*Delaware v. Prouse,* supra, 440 U.S. 648, 662, 99 S.Ct. 1391, 1400) such as the criteria articulated for a checkpoint stop (*United States v. Martinez–Fuerte,* supra, 428 U.S. 543, 553–554, 96 S.Ct. 3074, 3080–3081, 3082–3086).

*Id.* at 1308.

Deterrence, not a greater number of arrests, is the primary goal of a properly formulated and operated sobriety checkpoint program. Logically, if such checkpoints are truly accomplishing their purpose, DWI arrests, as well as DWI accidents, should decrease over time. It is for that reason that the argument asserted by the majority, stating that roving patrols based upon individualized suspicion are more effective, or are at least another effective means "in *eradicating* the intoxicated motorists," at 238 (emphasis supplied), begs the question.. Other states have recognized the fallacy in applying this "least intrusive rule," instead focusing upon the effectiveness of the roadblock in meeting the state interest of deterrence, balanced against the level of intrusion. *State v. Record,* 150 Vt. 84, 548 A.2d 422

(1988); *Ingersoll v. Palmer*, supra.[1] In Texas, as elsewhere, drunk driving is not merely a crime, it is a serious public safety problem. A vehicle driven by a drunk or intoxicated driver is as much, if not more, a hazard as a vehicle with defective brakes or lack of an adequate lighting or steering system. A sobriety checkpoint acts to keep such dangerous instrumentalities off the public roadways, thereby logically decreasing the number of DWI arrests in areas of roadblock operation.

It is the characteristic of motorized vehicles as hazardous or dangerous instrumentalities that demonstrates the distinction between a sobriety stop and an improper general "dragnet" stop. The automobile is stopped for reasons directly related to public safety, and not for purposes of criminal investigation. In this sense it is analogous to a permissible vehicle equipment inspection· checkpoint. Moreover, the fact that an officer may have the opportunity to observe a motorist's demeanor at the checkpoint is not determinative of the checkpoint's validity any more than an airport screening operation, a "roadblock" of all commercial air travelers, is a criminal investigative search impermissible under individual constitutional guarantees.

For the reasons given above, I will concur in the disposition of the first ground for review and in the result. I must respectfully dissent to the Court's analysis of the Fourth Amendment sobriety checkpoint issue for the reasons I have outlined *ante.*

McCORMICK, P.J., joins.

CAMPBELL, Judge, concurring.

Believing that the only issue presented in this case is whether the roadblock in *this case* [my emphasis] is constitutional, I concur in the result reached by the majority. I cannot countenance deciding an issue that is not before this court, i.e., whether DWI roadblocks are unconstitutional per se under the Fourth Amendment to the U.S. Constitution. The issue in this case is indistinguishable from that presented in *Webb v. State*, 739 S.W.2d 802 (Tex.Cr.App. 1987), and should not be decided in any broader context.

WHITE and BERCHELMANN, JJ., join.

---

1. It is the "alternative" of a roadblock stop and *not the alternative of traditional methods* employed by police agencies, that is the crux of the issue. While the State must without doubt demonstrate the need for such a practice, it does not follow that other tactics must be shown as wholly ineffective. However, if traditional methods were as effective as suggested by the majority opinion, the highway carnage judicially noticed by this nation's highest court would not exist.